1 | DENNLY R. BECKER
PRO SE
2 | 5462 BETTY CIRCLE
LIVERMORE, CA 94550
3 | (925)245-1457
FAX: (925)245-0968

**FILED**

JUN 19 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

7

## UNITED STATES DISTRICT COURT

8

## EASTERN DISTRICT OF CALIFORNIA — SACRAMENTO DIVISION

9

DENNLY R. BECKER; THE BECKER

10

TRUST DATED MARCH 25, 1991,

11

12

Plaintiff,

13

    vs.

14

WELLS FARGO BANK,NA,;WACHOVIA

15

MORTGAGE; DOES 1-20,

16

17

Defendant,

18

19

20

21

22

23

24

25

26

27

28

)
)  Case No.:2:10-cv-02799-LKK-KJN
)
)  HONORABLE LAWRENCE K. KARLTON
)
)  **PROPOSED REVISED THIRD AMENDED**
)  **COMPLAINT FOR:**
)
)  1. FRAUD
)  2. PROMISSORY ESTOPPLE
)  3. VIOLATION OF 12 U.S.C.
)     §2605 ET SEQ.
)  4. VIOLATION OF 12 C.F.R.
)     §560.101
)  5. PREEMPTED/UNLAWFUL
)     FORECLOSURE
)  6. IMPROPER FORECLOSURE
)     PROCESS
)  7. DEFAMATION
)  8. NEGLIGENCE & NEGLIGENT
)     INFLICTION OF EMOTIONAL
)     STRESS
)  9. RICO
)  10. INTENTIONAL INFLICTION OF
)      EMOTIONAL STRESS
)  11. ELDER ABUSE
)  12. VIOLATION OF TILA
)  13. VIOLATION OF UCL;
)
)  **REQUEST JURY TRIAL**
)
)
)
)
)
)
)

— 1

PROPOSED REVISED THIRD AMENDED COMPLAINT

Plaintiffs, Dennly R. Becker and Dennly R. Becker, Trustor and/or Trustee for the Becker Trust, dated March 25, 1991 (a revocable Living Trust) allege:

## PARTIES

1. Plaintiff Dennly R. Becker is and at all times herein mentioned was a resident of California. Dennly R. Becker is the Trustor and/or Trustee for the Becker Trust, dated March 25, 1991 (a revocable Living Trust) and represents the Trust in this action. The situs of the Trust is the state of California.

2. Defendant Wachovia Mortgage Corporation is a North Carolina corporation, where its headquarters and principal office are located, so it is a citizen of North Carolina. WACHOVIA agreed to purchase Golden West Financial for a little under $25.5 billion on May 7, 2006. By October 2, 2006 Wachovia had completed the acquisition of Golden West Financial Corporation. During the time covered by this complaint, Wachovia conducted business in California and San Joaquin County on a regular basis.

3. Defendant Wells Fargo Bank, National Association (herein after referred to as WELLS FARGO) is a a citizen of South Dakota with its main office located in Sioux Falls, South Dakota. On October 3, 2008, WACHOVIA agreed to be bought by WELLS FARGO for about $14.8 billion dollars in an all stock transaction. As a result of the acquisition, WELLS FARGO is responsible and liable for the actions of WACHOVIA during the times pled in this complaint. WELLS FARGO does business in California and within the County of San Joaquin on a regular basis.

4. DOES 1-20, inclusive, are individuals and/or businesses whose forms are unknown and were agents, principals, employees, employers, and co-conspirators of each and every other named

- 2

or unnamed Defendant in this complaint. Plaintiff is informed and believes, and thereon

alleges, that each of such Defendants is, and at all relevant times was, acting within the scope

of their authority as such agents, employees, or alter-egos and with the permission and

consent of the remaining named and un-named co-Defendants. The true names and/or

capacities of Defendants 1-20, inclusive, are unknown to Plaintiff, and therefore he sues said

Defendants by such fictitious names. Plaintiff will seek leave of the Court to amend this

complaint to allege the true names and/or capacities of said fictitiously named Defendants

when ascertained.

5. Whenever in this Complaint an act or omission of a corporation or business entity is alleged,

the said allegation shall be deemed to mean and include an allegation that the corporation or

business entity acted or omitted to act through its authorized officers, directors, agents,

servants, and/or employees, acting within the course and scope of their duties, that the act or

omission was authorized by corporate managerial officers or directors, and that the act or

omission was ratified by the officers and directors of the corporation.

## JOINT VENTURE

6. At all times during the periods complained of in this complaint, defendants WACHOVIA,

WELLS FARGO, and DOES 1-20 were engaged in a joint venture amongst themselves and

with other unknown third parties. All defendants came together for the purpose of denying

plaintiff loan modifications for the nine loans serviced by WACHOVIA and listed below,

and for extracting money from the plaintiff upon threat of seizing his property. All

defendants are attempting to achieve these goals through unlawful, unfair, and fraudulent

business practices. Each defendant financially benefitted, or intended to benefit from this

- 3

mutual undertaking. Each defendant complied with the requirements of the other defendants in order to insure that their mutual goals of denying plaintiff loan modifications and extracting money from him were fulfilled and each defendant thereby profited from these unlawful, unfair, and fraudulent business practices.

## JURISDICTION

7. This complaint seeks a determination in the rights and/or interests in nine separate pieces of real property in three counties. In this case, eight of the nine properties are located in counties that are in the United States District Court, Eastern District of California.

8. The State Court Action was removed to the United States District Court Eastern District of California by the Defendants on October 15, 2010 because of Diversity of Citizenship.

9. In addition, this complaint includes claims arising under federal statutes.

| | Address | Loan # | County | Legal Description |
|---|---|---|---|---|
| 1 | 865 Shelborne Dr. Tracy, CA 95377 | Wachovia 27736420 | San Joaquin | All that certain real property situated in the County of San Joaquin , City of Tracy, State of California, and is described as follows: Lot 26 as shown upon the Official Map of Tract No. 2406 Warmington Homes at Glencreek Unit No. 1 filed for record in Book of Maps and Plats, Vol. 31, Page 43, San Joaquin County records. Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below a depth of 500 feet without the right of surface entry. APN: 244-110-26 |
| 2 | 80 # 117 Portola Way, Tracy CA 95376 | Wachovia 28142651 | San Joaquin | All that certain real property situated in the City of Tracy, County of San Joaquin, State of California, described as follows: Lot 17. as shown on the Map entitled, "Tract No. 1840, Grant Line East Homes'" recorded August 22, 1984, in Book 26 of Maps, Page 155. APN: 214-360-17 |
| 3 | 80 # 118 Portola Way, Tracy CA 95376 | Wachovia 28186781 | San Joaquin | All that certain real property situated in the City of Tracy, County of San Joaquin, State of California, described as follows: Lot 18. as shown on the Map entitled, "Tract No. 1840, Grant Line East Homes'" recorded August 22, 1984, in Book 26 of Maps, Page |

- 4

| | | | | 155.<br>APN: 214-360-18 |
|---|---|---|---|---|
| | | | | All that certain real property situate in the City of Manteca, County of San Joaquin, State of California, described as follows: Parcel No. 1: Lot 71 as the same are shown upon that certain map entitled "Tract No. 2135, subdivision of San Joaquin County, Cobblestone Unit No. 1" filed in the Office of the County Recorder of San Joaquin County, California on September 16, 1992 in Book 31 of Maps and Plats, at Page 46.Except therefrom an undivided one-half interest in and to all oil, gas, petroleum, naptha and other hydrocarbon substances as reserved by the Federal Farm Mortgage Corporation, a Corporation in the deed recorded June 24, 1946 in Book 991 Official Records at page 344 as Recorder's Instrument No. 20606.Parcel No. 2: An appurtenant easement for the benefit of Lot 71, herein described for a 3.5' SYE (Side Yard Easement) over and across Lot 72 of Cobblestone Unit No. 1 as per map filed September 16, 1992 in Vol. 31 of Maps and Plats, Page 46, San Joaquin County records.Parcel No. 3: An appurtenant easement for the benefit of Lot 71 herein above described for a 3' RYE (Rear Yard Easement) over and across Lot 86 of Cobblestone Unit No. 1 as per map filed September 16, 1992 in Vol. 31 of Maps and Plats, Page 46, San Joaquin County records.Parcel No. 4: A non-exclusive easement for ingress and egress over the private streets shown as Lots A, B, C and D, upon that certain map entitled "Tract No. 2135 Subdivisions of San Joaquin County, Cobblestone Unit No. 1" filed in the Office of the County Recorder of San Joaquin County, California on September 16, 1992 in Book 31 of Maps and Plats, Page 46, San Joaquin County Records.APN No: 216-180-18 |
| 4 | 228 Quarry Stone Way, Manteca CA 95337 | Wachovia12231395 | San Joaquin | *(see above)* |
| 5 | 1440 Greenwich, Manteca CA 95337 | Wachovia 12968418 | San Joaquin | All that certain real property situate in the City of Manteca, County of San Joaquin, State of California, described as follows: Lot 195, Tract No. 1460, St. Francis Estates, Unit No. 4, as shown upon the Official Map thereof filed for the record October 26, 1978 in Volume 24 of Maps, Page 5, San Joaquin County Records. APN No: 202-250-13 |
| 6 | 434 Walnut Ave., Manteca CA 95336 | Wachovia 12966016 | San Joaquin | That certain real property situated in the State of California, County of San Joaquin, City of Manteca, described as follows: Lot 5 of Tract No. 2598 Walnut Place Unit No. 1 filed for record September 11, 1998 in Book of Maps and Plats , Book 33, page 86, San Joaquin county records |

- 5 -

| No. | Address | Lender/Loan | County | Description |
|---|---|---|---|---|
|  |  |  |  | APN: 217-660-05 |
| 7 | 2416 3rd StLincoln CA 95648 | Wachovia40518425 | Placer | The land referred to herein is situated in the County of Placer, State of California, and is described as follows:Lot 171, as shown on that contain Map entitled "Final Map of Brookview Unit No. 3", filed in the office of the County Recorder of Placer County, California on May 20, 1999, in Book V of Maps, at Page 42, and amended on January 20, 2000 in Book W of Maps, at Page 16.APN: 009-010-053 |
| 8 | 1895 Larkflower Way Lincoln, CA 95648 | Wachovia 40574170 | Placer | The land described herein is situated in the State of California, County of Placer, City of Lincoln, and is described as follows: Lot 186, as shown on that certain map entitled "Markham Ravine Estates Unit No. 4 Phase 2", filed in the Office of the County Recorder of Placer County, California, on June 9, 2000, in Book "W" of Maps, at page 37. APN: 319-050-020 |
| 9 | 814 Debra St, Livermore CA 94550 | Wachovia 12585220 | Alameda | All that certain real property situated in the City of Livermore, in the County of Alameda, State of California, and is described as follows: Lot 106, Tract 3222, filed December 17, 1970 in Book 66, Pages 49 to 55, inclusive, Alameda County Records. APN: 099A-1438-133 |

## FACTUAL ALLEGATIONS

10. The Plaintiff used World Savings to purchase nine of his investment properties using the World Savings "Pick-A-Pay" loans. These loans gave the borrower a choice of payment plans, including the option to defer paying a part of the interest owed, which was then added onto the balance of the loan.

11. Plaintiff is informed and believes, and on such information and belief alleges that all of the loans originated by World Savings for the benefit of the Plaintiff were "Portfolio Loans."

- 6

However, it is currently unclear who owns the promissory note and Deed of Trust for these nine loans because no assignment has been recorded.

12. On or about March 28, 2008 the Plaintiff was laid off from his job. Plaintiff's income was about $1500 per month. With unemployment benefits, the Plaintiff's monthly gross income dropped to approximately $4800 per month. The unemployment benefit expired after ninety nine weeks.

13. On or about August 15, 2008 the Plaintiff withdrew approximately $42,000 from his mutual fund investments to support his realty investments.

14. By August of 2009 the $42,000 from the plaintiff's mutual fund investments had all been used to make payments on his realty investments. Plaintiff realized that as a 65 year old unemployed man his prospects of gaining employment at his previous salary were not good. It became clear to the plaintiff that he could deplete all his mutual fund investments and have to default on all of his realty investments. This would put seventeen more foreclosed homes on a market already saturated with foreclosed homes.

15. On or about October 1, 2009 plaintiff decided to stop making mortgage payments on his investment at 865 Shelborne Dr. Tracy CA 95377.

16. On or about October 26, 2009 WACHOVIA agent Rachael Coronado called plaintiff to see if plaintiff could make a mortgage payment on Shelborne Dr. The plaintiff told Ms. Coronado that he could not make a payment unless the loan was modified. Ms. Coronado stated that the plaintiff should call the WACHOVIA Loan Counseling Department to discuss modification programs.

17. On or about November 4, 2009 plaintiff called WACHOVIA Loan Counseling and spoke with WACHOVIA agent Mr. Carl Saris. Plaintiff told Mr. Saris that plaintiff had nine

- 7

Wachovia loans on investment properties and that three of the loans had negative cash flow. Plaintiff told Mr. Saris that he needed a loan modification on his loan for 865 Shelborne Dr. Plaintiff also told Mr. Saris that his loans on 2416 3rd Street and 1895 Larkflower Way, both in Lincoln CA, were problems also since all three loans had a negative cash flow of about $500 per month. Mr. Saris asked if plaintiff could make loan payments on all three properties if the loans were modified to drop the payments on each by $500 per month. Also, Mr. Saris asked when plaintiff would be able to start making the payments. Plaintiff told Mr. Saris that he could start making the modified payments immediately. Mr. Saris requested that plaintiff verbally give him plaintiff's financial information. Plaintiff provided the information requested. Mr. Saris said he entered the information into WACHOVIA's computer and the results showed that the Shelborne, 3rd Street, and Larkflower loans could all be modified to lower the monthly payments for each by $500 per month. Mr. Saris then verbally gave the plaintiff a list of documents that plaintiff would have to provide to WACHOVIA to receive the loan modifications. Mr. Saris stated that once the documentation was received and reviewed, the modification would be processed quickly to lower the loan payments by $500 each. This would preserve the plaintiff's FICO credit score which was then about 730.

18. On November 9, 2009 plaintiff sent WACHOVIA, via overnight US Post Office mail, the information verbally requested by Mr. Saris, 147 pages, for modification of plaintiff's nine loans.

19. On or about December 16, 2009 plaintiff talked to WACHOVIA agent Alma Rios and asked Ms. Rios about the status of the Shelborne loan modification. Ms. Rios transferred plaintiff to WACHOVIA agent "Teo." Teo told plaintiff that his loan modification for Shelborne was not approved because plaintiff's income was too low. Teo mentioned that plaintiff would be

- 8

informed of this decision by letter soon. Plaintiff told Teo that he could take money out of his Individual Retirement Account (IRA). Plaintiff asked Teo if $2000 per month would be adequate. Teo stated that $2000 per month would make the difference and encouraged plaintiff to make the IRA withdrawals. Teo told Plaintiff to immediately reapply for the loan modification when he had proof of his IRA income.

20. On or about December 21, 2009 plaintiff requested a $2000 monthly IRA disbursement from his Fidelity IRA. The disbursements began in January of 2010.

21. On or about February 26, 2010, plaintiff called Wachovia and talked to Wachovia agent Anthony Brown. Plaintiff asked Brown to review the computer to see if documents recently provided by plaintiff had been received and if any other information was required. Brown stated that all information necessary had been received and he would get the information to underwriting. Mr. Brown stated that it would not take long for underwriting to make a modification determination.

22. On or about March 15, 2010 plaintiff received a letter from Citibank dated March 10, 2010 stating, "Based on Citibank's recent review of your credit bureau report, there has been a material change in your financial circumstances. As a result, we are suspending your HOME EQUITY LINE OF CREDIT." (Emphasis by Citibank). The reason for the loss of credit as stated in the Citibank letter was "Delinquent Credit Obligations (Paid/Unpaid) on Credit Bureau." At this time plaintiff was unaware of any negative input to his credit report other than from WACHOVIA. Plaintiff's credit line with Citibank was $76,000.

23. On or about March 29, 2010 at about 9:13 AM PST WACHOVIA agent Rodrick Allgood called plaintiff to ask for missing documents. Plaintiff informed Mr. Allgood that plaintiff had just spoken to Mr. Melendez who verified that all documentation had been received and

- 9

was in the WACHOVIA computer system. Mr. Allgood verified and concurred and stated that he would get the documents to underwriting. Mr. Allgood stated that it would take no longer then 30 days for underwriting to complete their review for the Shelborne loan modification. This statement was similar to the ones made by Mr. Saris in November of 2009 and Mr. Brown in February of 2010. The plaintiff was hopeful but doubtful.

24. On or about July 28, 2010 at about 8:20 AM PST, WACHOVIA agent Lindsay Vasquez called plaintiff. Ms. Vasquez verified that plaintiff's 37 page fax of July 27 requesting a permanent Shelborne loan modification had been received. Ms. Vasquez reviewed the documents with the plaintiff. Ms. Vasquez asked what payment plaintiff could make for the Shelborne loan and when plaintiff could start making the payments. Plaintiff stated that he could make a monthly payment of $1800 per month including tax and insurance starting September 1, 2010. Ms. Vasquez said this was acceptable to WACHOVIA. Plaintiff notes that this is the same modification that Mr. Saris said would be acceptable to WACHOVIA on November 4, 2009.

25. All claims are for all plaintiffs against all defendants.

## FIRST CLAIM

## FRAUD

26. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

27. On or about November 4, 2009, Wachovia agent Saris said plaintiff would quickly receive loan modifications for three of plaintiff's investment properties if plaintiff provided documentation that verified verbal information plaintiff had provided to Saris (TAC ¶ 17). Plaintiff provided the information (TAC ¶ 18). Wachovia agents Brown, Allgood, and Vasquez made similar representations (TAC ¶¶ 21, 23, 24.)

- 10

## A. Loss of Credit and Lower Monthly Payments

28. MISREPRESENTATION: Instead of quickly making the loan modifications, Wachovia engaged in delay and misrepresentations including:

a.   Nine letters dated November 18, 2009, one for each property, from Sharon Zuniga, Wachovia Senior Vice President denying the loan modifications because the properties were not owner-occupied. However, Saris knew the nine properties were not owner-occupied when he said plaintiff would get the modifications.

b.   Seven letters dated November 19, 2009 and one letter dated December 1, 2009 from Wachovia Loss Mitigation denying modifications because of "information contained in a credit report." Plaintiff requested information several times to determine what was wrong with his credit but got no reply. Plaintiff reviewed his credit report in December, 2009, and did not find any negative comments.

c.   On or about (OOA) December 16, 2009, Wachovia agent "Teo" told plaintiff the Shelborne modification was denied because plaintiff's income was too low. This representation is false because Mr. Saris stated the Wachovia computer showed that plaintiff would be quickly given loan modifications for his income properties.

d.   Letter dated January 6, 2010 from Sharon Zuniga, Wachovia Senior Vice President misrepresenting that plaintiff had withdrawn his request for a Shelborne loan modification.

e.  Misrepresenting many times that information or documents had not been received including: 1) January 12, 2010 Wachovia Loss Mitigation Department letter stating Shelborne modification documents missing. OOA January 15, 2010 plaintiff talked to Wachovia agent "Marisela" who verified that all the requested documents had been received; 2) OOA January 25, 2010 Wachovia agent Levonne Brown called to request documentation. Plaintiff had Ms. Brown check the computer. Ms. Brown did and stated that the computer showed all requested documents had been received; 3) OOA January 27, 2010 Wachovia agent Steve Kratz called to ask for Shelborne documentation. Plaintiff had Kratz check the computer. Kratz did and verified all requested documents had been received; 4) February 15, 2010 Wachovia Loss Mitigation letter asking for Shelborne information plaintiff had provided many times. OOA February 22, 2010, plaintiff talked to Wachovia agent "Josh" who verified all requested information had been received; 5) February 21, 2010 Wachovia Loss Mitigation letter stating Shelborne modification information missing. OOA February 26, 2010 plaintiff talked to Wachovia agent Anthony Brown who verified necessary information had been received.

f.  January 29, 2010, Wachovia Loss Mitigation letter stating the Shelborne loan modification request was closed because of missing documentation or information. OOA February 21, 2010 spoke to Wachovia Loan Counseling agent "Margie" who stated plaintiff's Shelborne modification request fell out of the system because of missing documentation. However, when plaintiff asked Margie

- 12

what documents were missing, she checked the computer and stated that all requested documents were received.

    g.    August 17, 2010, letter concerning Shelborne and August 31, 2010 letters concerning Larkflower and 3rd Street from Sharon Zuniga, Wachovia Senior Vice President, denying plaintiff's loan modifications because of "Excessive Financial Obligations." However, Wachovia agents Saris and Vasquez had already determined plaintiff was qualified for the loan.

29. KNOWLEDGE OF FALSITY: Wachovia uses a computer program that documents agents phone conversations, scans documents received and documents sent. When agents said documents were missing, plaintiff informed them they were wrong. The agents were able to use the computer and look at documents plaintiff sent, discuss the details of previous phone conversations with other agents, and discuss documents sent by Wachovia. Thus, all of the Wachovia agents and officers who made false representations knew they were false or they made them recklessly and without regard for their truth.

30. INTENT TO DEFRAUD: The Wachovia agents and officers who made the false representations intended that the plaintiff rely on the representations. They took the effort to write letters and make phone calls to convince plaintiff of their false representations.

31. JUSTIFIABLE RELIANCE: Plaintiff reasonably relied on the Wachovia agents who made false representations because they identified themselves as Senior Vice Presidents, underwriters, loan counselors, or members of the loss mitigation department.

32. RESULTING DAMAGE: Instead of making the loan modifications quickly, Wachovia delayed and denied the modifications and reported missed payments to the credit bureaus

– 13

causing plaintiff to lose a $76,000 home equity line of credit and the investment income it would have produced. The principal payments on three loans should have been each been lowered by $500 per month. Instead, debt and interest for these loans accrues at the unmodified payments.

**B.       Loss of Tax Deferred Income**

33. MISREPRESENTATION: Wachovia agent "Teo" represented to plaintiff that his Shelborne loan modification was denied because plaintiff's income was too low. Teo represented that monthly withdrawals from his retirement account would make plaintiff eligible for a Shelborne loan modification and that plaintiff should apply for the modification again when plaintiff had proof of his IRA withdrawals.

34. KNOWLEDGE OF FALSITY: Teo knew, or should have known, her representations were false. Plaintiff alleges Teo had access to the same computer system used by Mr. Saris to determine that plaintiff was eligible for loan modifications without the need for extra income.

35. INTENT TO DEFRAUD: Teo intended that plaintiff rely on the representation that plaintiff should make retirement account withdrawals because she encouraged him to make the withdrawals and to reapply for the Shelborne loan modification when plaintiff had proof of the monthly retirement withdrawals.

36. JUSTIFIABLE RELIANCE: Plaintiff reasonably relied on Teo's representations because Wachovia was threatening to foreclose on plaintiff's Shelborne property unless the loan was modified making plaintiff desperate to comply with Teo's representations.

37. RESULTING DAMAGE: Plaintiff lost tax deferred income on his retirement withdrawals.

///

## C. Fraudulent Loss of Forbearance Agreement Payments

38. On or about April 27, 2010, plaintiff received an unsolicited Forbearance Agreement from Wachovia dated April 26, 2010, representing that a permanent modification for the Shelborne property was available. Plaintiff signed the agreement and on or about May 11, 2010, was told by Wachovia agent Emma Alvarado the agreement was approved by Wachovia . Plaintiff complied with the terms of the Forbearance Agreement and made three payments for a total of $6713.13. Plaintiff received a Wachovia Loan Counseling letter dated July 14, 2010 thanking plaintiff for successful participation in the Temporary Payment Reduction Payment Plan and invited plaintiff to apply for a permanent Shelborne loan modification. Plaintiff did. Plaintiff received a letter dated August 17 from Sharon Zuniga, Wachovia Senior Vice President denying the permanent loan modification because of "Excessive Financial Obligations".

39. MISREPRESENTATION: The representation that plaintiff had "Excessive Financial Obligations" that caused denial of the permanent Shelborne loan modification was untrue.

40. KNOWLEDGE OF FALSITY: Defendants knew, or should have known, that plaintiff was qualified for the Shelborne loan modification because Saris and Vasquez had determined plaintiff was eligible and this information was in the Wachovia computer.

41. INTENT TO DEFRAUD: Although Saris and Vasquez had determined plaintiff was eligible for the Shelborne loan modification, defendants denied the modification anyway.

42. JUSTIFIABLE RELIANCE: Plaintiff had been working with defendants for about eight months to obtain a Shelborne permanent loan modification. The written Forbearance Agreement provided by the defendants appeared to represent the culmination of those efforts. In addition, plaintiff received a Wachovia Loss Mitigation letter dated May 3, 2010 stating

- 15

defendants had closed the Shelborne file and were going to proceed with collection and/or other remedies (implying foreclosure).

**43.** RESULTING DAMAGE: The Forbearance Agreement states that the Agreement payments will be applied to the total amount due. However, instead of making the loan modification quickly as was stated in November of 2009, Wachovia delayed the process for no good reason causing late fees to accumulate unnecessarily. Defendants had a NOD recorded on September 30, 2010 stating the amount delinquent for Shelborne was $24,878.11. However, plaintiff had already paid $6713.13 in forbearance payments. Thus, the amount listed in the NOD is far in excess of normal monthly payment due and expenses allowed in Cal. Civ. Code § 2924 et seq. Plaintiff's forbearance payments were applied to expenses far in excess of those for which he is responsible. In addition, because the modification was not made, arrears accrue at a higher rate.

## E.      Agency

44. Plaintiff alleges that Wachovia is responsible for plaintiff's harm because those individuals identified in the factual allegations including Mr. Saris, Sharon Zuniga, Senior Vice President Wachovia Mortgage, Alma Rios, "Teo", Lindsay Vasquez, "Marisela", Levonne Brown, Steve Kratz, "Margie", "Josh", Anthony Brown, "Jessica", John Rodriguez, and those Wachovia employees who sent letters from Wachovia Loss Mitigation and from Wachovia Loan Counseling whose names are unknown to plaintiff were acting as Wachovia's agents or employees when the incidents occurred. All of the above individuals made representations as statements of fact and claimed to have special knowledge because of their employment by the defendants.

- 16

45. Plaintiff alleges that Wachovia was the agent for Wells Fargo Bank NA when the incidents occurred.

46. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $76,000 excluding interest and costs), exemplary damages, prejudgment interest and costs.

## SECOND CLAIM

## PROMISSORY ESTOPPLE

47. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

48. Wachovia, through representations and actions, promised to quickly provide permanent loan modifications for plaintiff's Shelborne, Larkflower, and 3rd Street loans to lower the monthly payments by $500 for each loan.

49. Wachovia agent "Teo" told plaintiff that his income was too low to get the modifications. Teo encouraged plaintiff to start monthly disbursements and told plaintiff that about $2000 per month would make the difference needed and plaintiff should reapply for the modification when he had proof of the disbursements.

50. On or about December 21, 2009, plaintiff talked to Wachovia agent Lindsay Vasquez. Ms. Vasquez verified that plaintiff should reapply for the loan modification when he had proof of the monthly IRA withdrawals.

51. Based on Teo's and Ms. Vasquez's representations, on December 21, 2009, plaintiff requested a $2000 per month disbursement from his IRA fund manager. The disbursements began in January of 2010.

52. OOA July 28, 2010 Wachovia agent Vasquez reviewed with plaintiff on the phone plaintiff's financial information and stated that a modification of the Shelborne payment of $1800 per month including tax and insurance starting September 1, 2010 would be acceptable to Wachovia. This was the same modification promised by Mr. Saris on November 4, 2009.

53. Plaintiff received letters dated August 17 and August 31, 2010, from Sharon Zuniga, Senior Vice President Wachovia Mortgage stating that the Shelborne, Larkflower, and 3rd Street loan modifications were denied.

54. PROMISE RASONABLY EXPECTED BY THE PROMISSORY TO INDUCE ACTION: Wachovia's promise of loan modifications and promise that extra income of $2000 per month would make plaintiff eligible for the modifications would reasonably be expected by Wachovia to induce action by the plaintiff since plaintiff wanted to keep his property and the loan modifications would allow retention of the properties.

55. ACTION BY PROMISE IN JUSTIFIABLE RELIANCE: Plaintiff was told many times that he would be quickly given loan modifications to lower his monthly payments and that monthly IRA distributions would allow him to qualify for the modifications. Since the agents who made these representations worked for the company that would make the modifications, plaintiff justifiably relied on Wachovia's promises and provided requested information and documents numerous times at great time and expense. Plaintiff also made monthly IRA disbursements from his IRA to his detriment. Plaintiff lost tax deferred income on his disbursements.

56. INJUSTICE CAN ONLY BE AVOIDED THROUGH ENFORCEMENT OF THE PROMISE: This injustice can be avoided only through enforcement of the promise to

permanently modify plaintiff's Shelborne, Larkflower, and 3rd Street loans to lower each by $500 per month and by compensation for the loss of tax deferred income.

57. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (greater than $76,000 excluding interest and costs), exemplary damages, declaratory relief, prejudgment interest and costs.

## THIRD CLAIM

## VIOLATION OF 12 U.S.C. § 2605 et seq.

58. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

59. Pursuant to 12 U.S.C. §2605(e)(1)(B), on October 4, October 18, and October 29, 2010 plaintiff requested information, including payoff statements, from the defendants for his Shelborne, Larkflower, and 3rd Street loans. Pursuant to 12 U.S.C. §2605(e)(2), the defendants were required to provide the information within 60 days . The 60 day period has expired and the defendants have not provided the Shelborne information.

60. On December 1, 2010 plaintiff sent a QWR letter, signed and notarized, to Wachovia requesting evidence of indebtedness, payoff statements, and other specific information concerning the servicing of his loans for his other six properties that are the subject of this complaint. Wachovia has not provided the information.

61. On July 8, 2011, plaintiff again sent a QWR letter to Wachovia requesting evidence of indebtedness, payoff statements, and other specific information concerning the servicing of his loans for his other six properties that are the subject of this complaint. The letter identified the properties by addresses and loan numbers. Wachovia has not provided the information.

62. Since plaintiff's investments in his mutual funds and his IRA were not returning any income, it was plaintiff's plan to pay off the six loans identified in his December 1, 2010 letter and quit making interest payments. The outstanding principal on these loans was about $640,000. The total monthly interest payments for the six properties are about $3150 per month. However, given the malice and deceit by the defendants in previous transactions, it was an unacceptable risk to pay the six properties off unless plaintiff could pay them off completely and totally remove defendants' interests in the property. Without the payoff information requested of the defendants, plaintiff was not able to pay off the six properties and has to continue to make interest payments he otherwise would not have made.

63. Plaintiff has not received the information requested for his six properties listed in his December 1, 2010 letter and in his July 8, 2011 letter. Also, plaintiff has not received the information he requested for his Shelborne letter. Pursuant to 12 U.S.C. 2605 (f)(1)(B), the defendants have demonstrated a pattern or practice of noncompliance with 12 U.S.C. 2605. The defendants' failure to comply with 12 U.S.C. has caused the plaintiff actual damages because he has to continue making interest payments on the six properties.

64. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $75,000 excluding interest and costs) exemplary damages, prejudgment interest and costs.

## FOURTH CLAIM

## VIOLATION OF 12 C.F.R. § 560.101 AND CAL. CIV. CODE § 2923.6

65. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

66. The plaintiff has Wells Fargo Bank N.A. checking and savings accounts. The plaintiff also has Wells Fargo Bank N.A. stock. The money obtained by Wells Fargo through these

$- 20$

transactions is used for general banking purposes including originating loans, buying and selling notes and mortgages, and the servicing of loans. Thus, plaintiff is part of the defendants' loan pool.

67. At the beginning of the transactions described in this complaint, Wachovia Mortgage was a savings association regulated by 12 C.F.R. § 560.101. 12 C.F.R. § 560.101(b)(1)(i) requires defendants' real estate lending policies be consistent with safe and sound banking practices.

68. Cal. Civ. Code § 2923.6 states that the Legislature finds and declares that any duty servicers may have to maximize net present value under their pooling and servicing agreements is owed to all parties in a loan pool and not to any particular party in the loan pool. In addition a servicer acts in the best interests of all parties to the loan pool if it agrees to or implements a loan modification or workout plan for which both of the following apply:

   (1) The loan is in payment default, or payment default is reasonably foreseeable,

   (2) Anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value (NPV) basis.

69. Plaintiff is informed and believes and thereon alleges that to comply with 12 C.F.R. § 560.101(b)(1)(i) and with Cal. Civ. Code § 2923.6, defendants must maximize the NPV of the loan pool. Maximizing the net present value of the loan pool is required for safe and sound banking practices.

70. Plaintiff is in default for his Shelborne, Larkflower, and 3rd Street loans. To recover through foreclosure would require defendants to sell the property by bid or pay realty brokerage fees to sell on the open market, pay for the cost of foreclosure, absorb the costs of having the properties vacant for an extended period, and incur loss of value due to vandalism and decay.

Loan modifications at current market values and interest rates would exceed the anticipated

recovery through foreclosure on a NPV basis. Defendants' agents Saris and Vasquez have

already determined that plaintiff is qualified for the loan modifications. Also, plaintiff has

demonstrated he is ready and willing to make loan modification payments since he

successfully completed all Forbearance Agreement requirements.

71. Plaintiff is informed and believes and thereon alleges that for defendants to comply with 12

C.F.R. § 560.101(b)(1)(i), and with Cal. Civ. Code § 2923.6 they must make plaintiff loan

modifications for his Shelborne, Larkflower, and 3rd Street loans at market conditions as of

May 20, 2010 when plaintiff demanded such modifications.

72. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law,

including but not limited to actual damages (to be proven at trial but greater than $100,000

excluding interest and costs), exemplary damages, declaratory relief, prejudgment interest

and costs.

## FIFTH CLAIM

### PREEMPTED/UNLAWFUL FORECLOSURE

73. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

74. All nine of plaintiff's notes include the statement, "GOVERNING LAW; SEVERABILITY:

This note shall be governed by and construed under federal law and federal rules and

regulations including those for federally chartered savings institutions, called "Federal Law."

75. All nine of plaintiff's deeds of trust contain the statement, "GOVERNING LAW;

SEVERABILITY: This Security Instrument and the Secured Notes shall be governed by and

construed under federal law and federal rules and regulations, including those for federally

- 22

chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply,
by the law of the jurisdiction in which the Property is located."

76. The deeds of trust also contain the statement, "BORROWER'S TRANSFER OF RIGHTS IN
THE PROPERTY: I irrevocably grant and convey the Property to the Trustee, in trust for
Lender, with a power of sale subject to the terms of this Security Instrument." Paragraph 28
of the DOTs state, "If there is a Breach of Duty by me, Lender may exercise the power of
sale, take action to have the Property sold under applicable law, and invoke such other
remedies as may be permitted under any applicable law."

77. The statements concerning Governing Law are in both the notes and DOTs so, pursuant to
Cal. Civ. Code § 1642, it is clear that it is a primary concern for the defendants that federal
laws and regulations govern the notes and DOTs.

78. Defendants were regulated by OTS for the transactions described in this complaint. 12 C.F.R.
§ 560.2(b)(5),(9), (10) and (11) preempt state laws such as Cal. Civ. Code § 2924 et seq.
purporting to impose requirements regarding loan-related fees, advertising, disclosure,
processing and sale or purchase of mortgages, and disbursements and repayments. Therefore,
for these notes and DOTs, Cal. Civ. Code § 2924 et seq. is preempted and not an applicable
law for exercise of the power of sale for the properties.

79. In the alternative, the Governing Law, transfer of rights, and applicable law clauses create an
ambiguity and should be construed in favor of the plaintiff such that Cal. Civ. Code § 2924 et
seq. is not applicable for the notes and DOT's that are the subject of this complaint.

80. Plaintiff is informed and believes and thereon alleges since defendants wrote the contracts
they knew, or should have known, Cal. Civ. Code § 2924 et seq. is not an applicable law for

- 23

exercising the power of sale. Thus, in the taking of herein-discussed actions, defendants

attempted, with malice, to foreclose on plaintiff's Shelborne, Larkflower, and 3rd Street

properties. Plaintiff alleges defendants actions described herein, have damaged his

reputation, caused him emotional stress, cost him time and money to defend his reputation

and property, and destroyed his credit.

80. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law,

including but not limited to actual damages (to be proven at trial but greater than $76,000

excluding interest and costs), exemplary damages, declaratory relief, prejudgment interest

and costs.

## SIXTH CLAIM

## IMPROPER FORECLOSURE PROCESS

81. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

82. Defendants' agent, Cal-Western Reconveyance Corporation has had several documents

recorded concerning plaintiff's Shelborne, Larkflower, and 3rd Street properties. The

documents include Notices of Default, Substitutions of Trustee, Notice of Trustee's Sale, and

Notice of Withdrawal of Notice of Trustee's Sale. The documents were signed by individuals

identified as employees of Cal-Western Reconveyance Corporation and include Joe Krasovic

who signed the SOT for plaintiff's 3rd St property. The Substitutions of Trustee for plaintiff's

three properties were all notarized by Rosalyn Hall. Rosalyn Hall also notarized two

additional documents recorded for plaintiff's three properties (for a total of five). Rosalyn

Hall is identified in the California Secretary of State Notary data base as an employee of

Prommis Solutions, the parent company of Cal-Western Reconveyance Corporation. Plaintiff

has obtained certified copies of these documents from the County Recorder of the county

– 24

where the documents were recorded. Plaintiff has also received a certified Notary Oath card for Rosalyn Hall from the San Diego County Recorder.

83. Plaintiff recently became aware that the Maricopa County, Arizona Recorder website has a search feature that allows name searches and document viewing. Using this website, plaintiff received certified copies of 10 documents signed by Joe Krasovic. The plaintiff received 5 documents from Maricopa County, AZ notarized by Rosalyn Hall. The plaintiff submitted these documents to a forensic document examiner who has testified as an expert witness in this field in numerous state and federal courts. The plaintiff received the document examiner's report on September 28, 2011. The report concludes that for the eleven Krasovic documents, five different individuals wrote the name. For Rosalyn Hall, if the Notary Oath card contains the valid Rosalyn Hall signature, then none of the other ten documents (including the five for plaintiff's properties) were signed by Rosalyn Hall.

84. In addition, the documents show that Cal-Western Reconveyance Corporation notarizes documents in blank that are subsequently signed by other Cal-Western Reconveyance Corporation employees. Thus, the notary could not have identified who signed the document when it was actually signed. For example, one document was notarized by a Cal-Western employee on 8/21/2008. It was signed by an individual identified as Joe Krasovic on 5/12/2009, over eight months later! Another document was notarized by a Cal-Western employee on 5/29/2009. It was signed by an individual identified as Joe Krasovic on 6/23/2009, almost a month later.

85. Based on the above three paragraphs, plaintiff is informed and believes, and on such information and belief alleges that defendants' agent, Cal-Western Reconveyance

– 25

Corporation engages in the fraudulent and illegal practice known in the loan industry and by the press as "Robosigning."

86. Plaintiff is informed and believes that since defendants knew they were using a fraudulent and illegal foreclosure process, it was with malice that defendants recorded, posted, published, and sent NODs, Substitutions of Trustee, and Notices of Sale for plaintiff's Shelborne, Larkflower, and 3rd Street properties.

87. Tender is not required for this claim since defendants can use legal means to exercise the rights given them in the notes and deeds of trust.

88. Plaintiff alleges defendants' actions described herein, have damaged his reputation, caused him emotional stress, cost him time and money to defend his reputation and property, and destroyed his credit.

89. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $76,000 excluding interest and costs), exemplary damages, declaratory relief, prejudgment interest and costs.

## SEVENTH CLAIM

## DEFAMATION

90. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

91. In violation of the Court's order (Dkt. #21), on or about December 28, 2010, the defendants' agent posted, published, and recorded a Notice of Trustee's Sale (NOS) for the 3rd Street property with a Trustee's Sale scheduled for January 19, 2011. On or about April 16, 2012, defendants' agent posted, published, and recorded a Notice of Trustee's Sale for the Shelborne property with a Trustee's Sale scheduled for May 16, 2012. The NOSs were

PROPOSED REVISED THIRD AMENDED COMPLAINT

issued in violation of the court order and, thus, were malicious and not a privileged communication.

92. Until plaintiff's complaint is resolved, the amount plaintiff owes defendants, if any, is not clear. In addition, on or about October 18, 2010, plaintiff sent letters to defendants' trustee informing the trustee, and thus defendants, that the amount owed is in dispute.

93. The NOS posted, published, and recorded for the 3rd Street property claims plaintiff is in default to defendants in the amount of $296,316.89. The NOS recorded and mailed for the Shelborne property claims plaintiff is in default to defendants in the amount of $331,036.46.

94. DEFENDANTS MADE STATEMENTS TO PERSONS OTHER THAN PLAINTIFF: Plaintiff's tenants at his 3rd Street property and at his Shelborne property, and those who read the newspaper in which the NOSs were published, and those who view the recorded NOSs would reasonably understand what the NOS is about.

95. THESE PEOPLE REASONABLY UNDERSTOOD THE STATEMENTS WERE ABOUT PLAINTIFF: The two NOSs have plaintiff's name prominently displayed in their text.

96. THESE PEOPLE REASONABLY UNDERSTOOD STATEMENTS: The people who read the NOSs would reasonably understand the NOSs mean that plaintiff is a deadbeat without integrity who does not pay his bills and cannot be trusted.

97. STATEMENTS FALSE: Defendants know the amount owed to them by plaintiff, if any, is in dispute and has not been determined and thus, that the statements in the NOS are false or seriously in doubt.

98. FAILURE TO USE REASONABLE CARE: Defendants and their agent failed to use reasonable care to communicate and to determine the truth or falsity of the statements in the NOSs before they recorded, published, and posted the NOSs.

- 27

99. Pursuant to Cal. Civ. Code § 46, defendants' defamation of plaintiff's character tends to directly injure him with respect to his profession of advertising, renting, and managing his investment properties. Plaintiff's profession requires integrity. Defendants' defamation of his integrity has a natural tendency to lessen his profits. Defendants' actions have caused plaintiff shame and mortification. Defendants' actions were malicious and fraudulent.

100. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, assumed damages, punitive damages, (damages to be proven at trial but greater than $76,000 excluding interest and costs) prejudgment interest and costs.

## EIGHTH CLAIM

## NEGLIGENCE & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

101. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

102. Plaintiff claims that defendants' conduct caused him to suffer serious emotional distress.

103. Based on the *Biakanja* factors [*Biakanja v. Irving*, 49 Ca.2d 647, 122 P.2d 293 (1958)] and the *Roe* factors [*Glen K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1197 (9th Cir. 2001)] and pursuant Cal. Civ. Code § 1714, defendants owed plaintiff a duty of care for the transactions discussed below.

## A. Loan Modification Process

104. The end aim of the loan modification process was to quickly modify plaintiff's Shelborne, Larkflower, and 3rd Street properties so plaintiff could keep these properties, make loan payments, and protect his credit.

- 28

105.    Defendants' agents represented to plaintiff that loan modifications would be quickly

made for his Shelborne, Larkflower, and 3rd Street properties. Instead, over a prolonged

period, defendants' agents negligently represented that documents were missing, plaintiff had

withdrawn from the modifications, plaintiff's credit caused denial of the modifications or

plaintiff's income was too low or too high. In the meantime, defendants were reporting

missed payments to the credit bureaus and, in the end, did not make the loan modifications.

106.    Plaintiff's damages include loss of income due to loss of credit; loss of tax deferred

income; loss of loan modification and associated monthly loan payment savings; and loss of

forbearance agreement payments. Defendants' negligence caused plaintiff to suffer serious

emotional distress.

107.    Defendants' negligence was a substantial factor in causing plaintiff's serious emotional

distress.

## B. Preempted Foreclosure

108.    The end and aim of foreclosure with the applicable law is to ensure plaintiff has every

legal means to protect his property. Based on the provisions in the notes and deeds of trusts

signed by plaintiff and based on HOLA preemption regulations, non-judicial foreclosure for

plaintiff's properties is preempted. However, beginning in about September 2010, defendants

negligently attempted to non-judicially foreclose on plaintiff's Shelborne, Larkflower, and 3rd

Street properties.

109.    Plaintiff's harm includes damage to his reputation, time and money to defend his

reputation and property, all loss of credit. Plaintiff suffered serious emotional distress due to

defendants' negligence.

- 29

110.    Defendants' negligence was a substantial factor in causing plaintiff's serious emotional distress.

## C.  Attempted Foreclosure in Violation of Court Order

111.    The end and aim of the court order dated December 13, 2010 (Dkt. #21) granting plaintiff a preliminary injunction is to enjoin defendants from foreclosing on plaintiff's Shelborne, Larkflower, and 3rd Street properties. However, due to defendants negligence, on or about December 28, 2010, a NOS was posted on plaintiff's 3rd Street property with notification that sale of the home would occur in January of 2011. The NOS was recorded and published in a local newspaper. On or about April 16, 2012, due to defendants' negligence, a NOS was recorded and mailed to his tenants at 865 Shelborne with notification that sale of the Shelborne property would occur on May 10, 2012.

112.    Plaintiff's harm includes damage to his reputation and time and money to keep his property from being sold in violation of the preliminary injunction. Plaintiff suffered serious emotional distress due to defendants' negligence.

113.    Defendants' negligence was a substantial factor in causing plaintiff's serious emotional distress.

## D.  Improper Foreclosure Process

114.    The end and aim of non-judicial foreclosure using the proper foreclosure process is to ensure plaintiff has every legal means to protect his property.

PROPOSED REVISED THIRD AMENDED COMPLAINT

115.   Defendants have used a fraudulent and illegal non-judicial foreclosure process commonly known as "Robosigning" to attempt to foreclose on his Shelborne, Larkflower, and 3rd Street properties.

116.   Plaintiff's harm includes damage to his reputation, time and money to defend his reputation and property, and loss of credit. Plaintiff suffered serious emotional distress due to defendants' negligence.

117.   Defendants' negligence was a substantial factor in causing plaintiff's serious emotional distress.

118.   WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $76,000 excluding interest and costs), exemplary damages, prejudgment interest and costs.

## NINTH CLAIM

## VIOLATION OF 18 U.S.C. § 1961 ET SEC. - RICO

119.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

120.   Defendants are persons pursuant to 18 USC § 1961(3) since they are entities capable of holding a legal or beneficial interest in property.

121.   Defendants are enterprises pursuant to 18 USC § 1961(4) since they are legal entities. Wachovia Mortgage and Wells Fargo Bank, N.A. continue in business as legal entities. Wachovia Mortgage merged into Wells Fargo Bank so they function as a continuing unit. Both defendants are engaged in interstate commerce since they originate, service, and sell loans in several states.

122.  Defendants engaged in prohibited activities pursuant to 18 USC § 1962(c) since they caused an enterprise (themselves) engaged in interstate commerce, while employed by the enterprise, to conduct or participate in a pattern of racketeering activity described below.

123.  Alternatively, pursuant to 18 USC § 1962(a), defendants received income derived from a pattern of racketeering activity, as described below, and used the income to acquire or invest in an enterprise in interstate commerce. Defendants derive income from such activities to invest in themselves by paying their employees and agents, paying down portfolio loans, and deriving income from servicing agreements and trustee agreements.

## A. Mail Fraud (18 USC § 1341) and Wire Fraud (18 USC § 1341) to Deny Quick Loan Modifications

124.  Defendants agents told plaintiff he was eligible for loan modifications that would be quickly made to lower his Shelborne, Larkflower, and 3rd Street property loans by $500 per month each.

125.  MISREPRESENTATIONS BY MAIL AND WIRE: Instead of quickly making the loan modifications, Wachovia engaged in fraudulent activities, described in Claim One, that harmed the plaintiff. During the course of the activities, the agents who plaintiff talked to by phone said they were calling from Texas. The letters plaintiff received from defendants have a return address and letter head indicating they were sent from Texas. Those agents of defendants who sent the letters that are not signed are not known to plaintiff.

126.  PROXIMATE – BUT FOR: Defendants misrepresentations were the proximate cause of plaintiff's injuries. But for defendants' fraudulent denial of quick loan modifications, plaintiff would not have suffered these damages.

- 32

127.    PATTERN: Defendants have fraudulently denied quick loan modifications for three of plaintiff's loans within the last 10 years.

**B. Mail Fraud (18 USC § 1341) and Wire Fraud (18 USC § 1341) to Improperly Foreclose**

128.    Defendant Wachovia directs their agent, Cal-Western Reconveyance Corporation, to engage in foreclosure activities using mail and wire. The Wachovia foreclosure unit is in Texas and Cal-Western Reconveyance Corporation is in California.

129.    MISREPRESENTATIONS BY MAIL AND WIRE: Defendants agent, Cal-Western Reconveyance Corporation engages in the fraudulent and illegal foreclosure process commonly known as "Robosigning". Defendants have had recorded three Substitutions of Trustee signed by various Cal-Western employees and notarized by "Rosalyn Hall". The notary statement claims, under penalty of perjury, that the individual who signed the documents proved their identity to the notary. However, a forensic document examiner has examined many documents signed by Cal-Western employees and concluded that several different individuals are signing the same name including "Rosalyn Hall." Thus, the notary's statement is a misrepresentation. Based on information and belief, plaintiff alleges Wachovia directed Cal-Western to record these documents using interstate mail and/or wire. Those agents of Wachovia who directed Cal-Western are unknown to defendant.

130.    KNOWLEDGE OF FALSITY: Defendants agents who signed other employees' names and who notarized the signatures of those individuals knew of the falsity of their actions.

131.    INTENT TO DEFRAUD: Defendants agents intended that plaintiff rely on their representations because they took the time and effort to make the misrepresentations and record the NODs and Substitutions of Trustee.

- 33

132.   JUSTIFIABLE RELIANCE: Plaintiff justifiably relied on the representations made by defendants' agents because they recorded the documents with the misrepresentations and made representations under penalty of perjury.

133.   RESULTING DAMAGE: The defendants attempted to cause immediate and irreparable damage by foreclosing on plaintiff's Shelborne, Larkflower and 3rd Street properties by recording fraudulent documents. Legal foreclosure requires careful examination of documents including notes, deeds of trust, payment histories, and calculation of fees pursuant to Cal. Civ. Code 2924 et seq. Instead of using this legal process, defendants save money by using robosigners who sign hundreds of documents per day and who review and verify nothing. Defendants have caused plaintiff considerable time and money to prevent the foreclosures. Defendants actions have caused plaintiff severe emotional distress.

134.   PROXIMATE – BUT FOR: Defendants misrepresentations were the proximate cause of plaintiff's injuries. But for defendants' actions, plaintiff would not have suffered these damages.

135.   PATTERN: Defendants have fraudulently attempted to foreclose on three of plaintiff's properties within the last 10 years using fraudulent documents.

136.   CONTINUING THREAT TO PUBLIC: The defendants' activities are a continuing threat to the public. Defendant Wells Fargo signed a Consent Order with the Comptroller of the Currency on April 13, 2011 (RJN Exhibit 1). Corrective actions were to be implemented within 120 days. Article IV, Compliance Program, of the consent agreement requires, inter alia, (b) processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review

of the Bank's books and records when the affidavit of declaration so states; (c) processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements. The defendants' violations of these corrective actions are well documented in this complaint including the use of "Robo-Signers" who review and verify nothing. Defendants' violations continue. Plaintiff has filed another complaint in this District Court (2:12-cv-0501) that includes alleged facts occurring after the 120 day implementation period. Defendants had filed a NOD against one of plaintiff's properties on August 17, 2011. The document was signed by "Hank Duong." Plaintiff obtained certified copies of 9 other documents supposedly signed by this individual and had them analyzed by a forensic document examiner who concluded they were signed by two different individuals. Two of the documents are included in the RJN as Exhibits 2 and 3. Defendants have not implemented the OCC corrective actions and their unsafe and unsound banking practices continue to threaten the public.

137. WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $75,000 excluding interest and costs), exemplary damages, prejudgment interest and costs.

## TENTH CLAIM

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

138. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

139. Defendants acted with reckless disregard in causing plaintiff severe emotional distress including anguish, nervousness, grief, anxiety, worry, and humiliation.

- 35

## A. Loan Modifications

140.   OUTRAGEOUS CONDUCT: The defendants promised to quickly modify plaintiff's loans. After being laid off and seeing thirty years of investment lost, these promises gave plaintiff great hope. Instead, over a prolonged period of time, defendants said he was not eligible for the modifications and then changed their minds several times, defendants said documents were missing many times when they were not, defendants offered a forbearance agreement then, after taking plaintiff's payments, fraudulently said plaintiff was not eligible.

141.   RECKLESS DISREGARD: Defendants have a computer system that allows agents to verify their representations before they make them. Defendant's agents should have known documents were not missing when they wrote letters or called to state documents were missing. Defendant's agents should have known that other agents had told plaintiff he would receive modifications before they sent letters stating plaintiff was not qualified and before they denied plaintiff the modification option in the forbearance agreement. Because they did not do this, defendants acted with reckless disregard of the probability of causing plaintiff severe emotional distress including anguish, nervousness, grief, anxiety, worry, and humiliation.

142.   HARM: Plaintiff was elated when initially told he would receive loan modifications that would allow him to keep his investments viable and preserve his credit. Plaintiff eagerly assembled about 147 pages of documents and went to a local Wells Fargo Bank to have them faxed to defendants. Defendants then engaged in the prolonged misrepresentations described above causing plaintiff severe emotional distress including loss of sleep, mental anguish, loss of confidence in himself, and prolonged worry.

143.    SUBSTANTIAL FACTOR: Defendant's misrepresentations were a substantial factor in causing plaintiff's severe emotional distress.

**B. Violation of Court Order**

144.    OUTRAGEOUS CONDUCT: The Court issued a preliminary injunction (Dkt. #21) on December 13, 2010, enjoining defendants from foreclosure sales of his 3rd Street, Shelborne, and Larkflower properties.

145.    RECKLESS DISREGARD: Recklessly disregarding the Court's order, defendants or their agent recorded Notice of Trustee's Sale for both his 3rd Street and Shelborne properties after the Court's order was issued. Because they violated the court order, defendants acted with reckless disregard of the probability of causing plaintiff severe emotional distress including anguish, nervousness, grief, anxiety, worry, and humiliation.

146.    HARM: Plaintiff had to expend considerable time and money over a prolonged period of time to stop the enjoined sale of his properties including filing motions for an order to show cause, having defendants' trustee served twice with the court order, and communicating with defendants' council many times to stop the sales. Defendants' violations of the court order occurred over a year apart. Thus, plaintiff must be eternally vigilant because defendants have demonstrated they are likely to violate the court's order at any time causing plaintiff immediate and irreparable injury. Defendants' actions caused plaintiff severe emotional distress including loss of sleep, mental anguish, loss of confidence in himself, and prolonged worry.

147.    SUBSTANTIAL FACTOR: Defendant's actions were a substantial factor in causing plaintiff's severe emotional distress.

- 37

148.     WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $76,000 excluding interest and costs), exemplary damages, prejudgment interest and costs.

## ELEVENTH CLAIM

## ELDER ABUSE

149.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

150.     Plaintiff alleges that defendants violated the Elder Abuse and Dependent Adult Civil Protection Act by taking financial advantage of him.

151.     Defendants obtained plaintiff's property including Shelborne Forbearance Agreement payments, debt accruing at an extra $500 per month for his Shelborne, Larkflower, and 3rd Street properties, and are attempting to take his Shelborne, Larkflower, and 3rd Street properties. In addition, the defendants' actions destroyed his credit and caused him to lose tax free income from his retirement account.

152.     The plaintiff was 65 years of age or older at the time of the conduct.

153.     Defendants took, or are attempting, to take plaintiff's property with the intent to defraud. Defendants' actions include negligent misrepresentation, fraud, false promise, breach of contract, violation of 12 U.S.C. § 2605, unfair debt collection, preempted/unlawful foreclosure, improper foreclosure process, RICO, negligent and intentional inflection of emotional distress, defamation, and violation of the unfair competition law.

154.     The plaintiff was harmed and the defendants' conduct was a substantial factor in causing plaintiff's harm.

155.     Plaintiff alleges that defendants knew, or should have known, that their conduct was likely to be harmful to plaintiff and that plaintiff is a senior citizen.

- 38

156.    Defendants caused a senior citizen to suffer a loss of income and substantial loss of property set aside for retirement.

157.    Plaintiff is substantially more vulnerable than other members of the public to the defendants' conduct because at plaintiff's age he cannot find a job in his field to replace losses caused by defendants.

158.    WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to actual damages (to be proven at trial but greater than $76,000 excluding interest and costs), exemplary damages, prejudgment interest and costs.

## TWELFTH CLAIM

### (Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.*,

159.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

160.    15 U.S.C. §1601, *et seq.*, is the Federal Truth in Lending Act ("TILA"). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. § 226 ) and its Official Staff Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

161.    Defendants' Option ARM loans violate TILA because defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to plaintiff as defendants were required to do under TILA.

- 39

**A.    Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the Actual Interest Rate Violates TILA**

162.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.18 require the lender to make disclosures concerning the interest rate and payments in a clear and conspicuous manner. Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

163.    For plaintiff's Option ARM loans, defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.18 in that they failed to clearly and conspicuously disclose the interest rate upon which the payments listed in the Truth In Lending Disclosure Statement (TIDLS) are based. Defendants' failure to clearly and conspicuously disclose the interest rate upon which the payment amounts were based was, and is deceptive.

164.    Further, in addition to defendants failure to disclose in the Note and TILDS that the payments listed were not based upon the interest rate listed, defendants knowingly and intentionally stated in each of the Notes that the payments would be applied to both principle and interest. Defendants further stated in the Notes that, "from time to time" the payments "may not" be enough to cover all of the interest due on the Notes. However, in truth, if plaintiff followed the payment schedule provided by defendants, the payments were guaranteed to be insufficient to pay the principle and interest on the loan. Thus, negative amortization was not just a mere possibility, it was an absolute certainty.

165.    Defendants purposefully and intentionally failed to disclose to plaintiff the interest rate upon which the payment schedule was based in order to mislead and deceive plaintiff into believing that he would be getting a loan with a low payment that would be sufficient to pay both interest and principle.

- 40

166.    The payment amount provided by defendants was intended to and did deceive plaintiff into falsely believing he would, in fact, receive the low interest rate upon which the payment schedule is based. While the Note states the amount of plaintiff's initial monthly payment, however, the initial monthly payment amounts stated in the Note and TILDS are not in any related to the interest rate listed in the Notes and TILDS.

167.    The TILDS are also deceptive for much the same reason. The TILDS list a schedule of payments, yet for up to the first ten years the listed payment amounts have no relation to, and are also not based on the interest rate listed in the TILDS.

168.    The defendants failed to clearly, conspicuously and accurately disclose a payment amount that corresponds to the actual interest rate being charged on the loan sufficient to pay both principle and interest. The Notes state "the payments will be applied to principle and interest." Thus, plaintiff reasonably believed that if he made the payments according to defendants' payment schedule, the payments would, in fact, be paying of both principal and interest. However, the true fact is that the payment amounts stated in defendants' payment schedule did not include any principal on the loans at all and only covered a portion of the interest defendants were charging on these loans.

**B.      Defendants' Failure to Clearly and Conspicuously Provide Negative Amortization Disclosures Violates TILA**

169.    Payments made according to the payment schedule in the TILDS guarantee that the loans are negative amortization loans.

170.    12 C.F.R. § 226.18 provides for the content of disclosures including:

§ 226.18(s)(2)(ii)(A) The interest rate at consummation and, if it will adjust after consummation, the length of time until it will adjust, and the label "introductory" or "intro"

171.  The Shelborne note (Declaration Exhibit 4) states that the principal is $311,500 and the interest rate is 5.220% on a yearly rate. The note also states that the interest rate "may change" on the 1st day of April, 2005. The TILDS (Declaration Exhibit 5) states the amount financed is $307,630.95 and the first twelve monthly payments are $1,271.68.

172.  The first principal and interest payment for $311,500 at 5.220% for 30 years would be about $1714. Of this amount, about $1355 is interest and about $359 is principal. The first interest and principal payment for $307,631 at 5.220% for 30 years would be about $1693. Of this amount, about $1338 is for interest and about $335 is for principal. Calculations at the APR of 5.299% would provide larger differences to the monthly amount of $1,271.68 in the TILDS.

173.  It is not clear what the interest rate was at consummation, when it adjusts, or the length of time until it adjusts. It is clear from the TILDS that there is an introductory interest rate because the payment of $1,271.68 is less than interest calculated for the amount listed in the note as principle and the amount listed in the TILDS as amount financed. Whatever this interest rate is, it is not listed as introductory.

174.  12 C.F.R. § 226.18(s)(2)(ii)(C) requires:

If the minimum required payment will increase before the consumer must begin making fully amortizing payments, the maximum interest rate that could apply at the time of the first payment increase and the date the increase is scheduled to occur;

175.  The note section 2.(A) states:

**Interest Rate** Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of 5.220%. The interest rate I

will pay may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

176.  The note section 2.(B) states:

**Interest Change Dates** The interest rate I will pay may change on the 1st day of April, 2005 and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

177.  According to the note, one must look at Section 2 to determine how and when the interest rate will change. The date cannot be determined for the first, second, or successive interest rate changes because the statement in Section 2.(B) is that the interest rate "may change" on the 1st day of April, 2005 and on the same day every month thereafter.

178.  The note section 3.(C) discusses payment change dates but these dates have nothing to do with interest rate changes. Note section 3.(E) discusses interest rate changes but does not address when the interest rate will chance. However, this section has no bearing on the interest rate that will be paid because note section 2.(A) specifically states, "The interest rate I will pay may change as described in this Section 2."

179.  The defendants failed to provide the required negative amortization disclosures. The statements in the note are confusing so it is not clear how interest rates should have changed, if at all, and when interest rates should have changed. Section 2 of the note could be read to mean that the interest rate is fixed at 5.220% since section 2 does not include the index, the margin, or any required change dates.

**C.    Defendants' failure to Clearly and Conspicuously Disclose The Legal Obligations Violates Truth in Lending Laws**

- 43

180. 12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."

181. Official binding staff commentary on 12 C.F.R. § 226.17(c)(1) requires:

"[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction. In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided."

182. The Official binding staff commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that:

"[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the agreement."

183. Official Staff Commentary to 12 C.F.R. § 226.17(c)(1) states:

"[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

184. The defendants option ARM loans violated 12 C.F.R. § 226.17(c) in that the note and TILD do not disclose, and by omission, failed to disclose what plaintiff was legally obligated to pay. In particular, the note(s) charged the borrower a much higher monthly amount than the defendants disclosed. Defendants accomplished this deception by only listing a partial payment in the TILD, rather than the full payment the borrowers were being charged for the loans and were legally obligated to pay.

185. As a direct and proximate result of defendants' omission and failure to clearly and conspicuously disclose plaintiff's legal obligations under the loans, defendants took the partial payments and secretly added the deficit, each month, to principal, thereby causing negative amortization to occur. In addition, defendants' omission makes it appear that

- 44

principal and interest payments are lower than is actually required by the terms of the note. This prevented plaintiff from comparing the terms offered by defendants to those offered by competitors and defeated the purpose of the TILA.

**D.**     **Defendants Failure to clearly and Conspicuously disclose the Effect of the Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

186.     The Option ARM loans at issue each contained a variable rate feature with an initial (undisclosed) teaser rate with payment caps. The payment cap is a limit on how much the payment may be increased annually. Its purpose is to provide borrowers with a limit on how much their payment can increase from year to year. The loans issued by defendants has a 7.5% payment cap, which means that a borrower would only see their payment rise each year by a maximum of 7.5%. (i.e. a $1,000 monthly payment in year one, could go to a $1,075 payment in year two.)

187.     The Official Staff Commentary to 12 C.F.R. § 226.17(c)(1)(10)iii states:

>     "[i]f a loan contains a rate or payment cap that would prevent the initial rate of payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

Thus, the defendants had a duty to plaintiff to disclose the effect the payment caps would have on the loans in the TILD.

188.     The defendants failed to disclose, and by omission, failed to inform plaintiff that the payment cap would cause thousands of dollars to be secretly added to principal.

189.     As a direct and proximate result, defendants failed to disclose, and by omission, failed to inform plaintiff of the effect of the payment cap in violation of 12 C.F.R. § 226.17

- 45

## F.    Effect of Failures and Omissions

190.    The defendants' failure to comply with TILA and the omissions of certain required

disclosures made defendants' loan terms appear much more competitive than they actually

were. Had defendants complied with TILA and made all required disclosures, plaintiff would

not have purchased the Larkflower, Shelborne, and 3rd Street properties. As a direct and

proximate result of defendants' failures and omissions, plaintiff lost the down payments,

fees, interest, and other payments he made.

## G.    Equitable Tolling

191.    In mid-January of 2012, plaintiff was discussing his case against defendants with a

neighbor. The neighbor stated she had her home loan with defendants and was involved in a

class action case against the defendants. She did not understand the case so showed plaintiff

the information she had received. The complaint includes, inter alia, a claim for violations of

TILA, 15 U.S.C. §1601, et seq. After carefully reviewing the allegations in the complaint and

his own loan documents, plaintiff determined defendants misrepresented that the loans for his

Shelborne, Larkflower, and 3rd properties complied with TILA.

192.    The misrepresentations concerning TILA are complex and devious and there are many

omissions of required disclosures. To determine the misrepresentations one needs to use the

class action complaint as a road guide to find terms in several documents such as interest

rate, interest change dates, amount of initial monthly payment, principal, limit on unpaid

principal, amount financed, margin, cap rates, adjustment period, and more. One must then

have a sophisticated financial calculator and make multiple calculations to determine what

was disclosed compared to what was required to be disclosed. At the time of the loan

- 46

originations, plaintiff did not have the road map or the financial calculator and could not determine the TILA violations and omissions.

193.    WHEREFORE, plaintiff is entitled to an order declaring that defendants violated TILA, 15 U.S.C. § 1601, et seq., that plaintiff be awarded damages pursuant to 15 U.S.C. § 1640, and costs and expenses.

## THIRTEENTH CLAIM

## VIOLATION OF CAL. BUS. & PROF.C. § 17200 et seq.

194.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein..

195.    Defendants have committed acts of unfair competition as defined by Cal. Bus. & Proc.C. §17200 by committing the following unlawful acts:

196.    Fraud: The particularities of the unlawful acts are contained in Claim 1.

197.    Negligent Misrepresentation: The particularities of the unlawful acts are contained in Claim 2.

198.    Negligence: The particularities of the unlawful acts are contained in Claim 3.

199.    False Promise: The particularities of the unlawful acts are contained in Claim 4.

200.    Breach of Implied Contract: The particularities of the unlawful acts are contained in Claim 6. Plaintiff relied on the defendants' representation in the Forbearance Agreement that a permanent loan modification was available.

201.    Violation of 12 USC § 2605 et seq.: The particularities of the unlawful acts are contained in Claim 7. Plaintiff relied on defendants compliance with 12 USC § 2605 et seq. so he could pay off six of his loans with defendants.

202.    Unfair Debt Collection: The particularities of the unlawful acts are contained in Claim 8.

A. Violation of 15 USC §1692e(10) and Cal. Civ. Code §1788.13(i): Plaintiff relied on the defendants' representation in the Forbearance Agreement that a permanent loan modification was available.

B. Unfair Debt Collection Practices: Plaintiff relied on defendants' representations that plaintiff's Shelborne, Larkflower, and 3rd Street loans would be modified quickly.

203.    Violation of 12 C.F.R. § 560.101 and Cal. Civ. Code § 2923.6: The particularities of the unlawful acts are contained in Claim 9.

204.    Preempted/Unlawful Foreclosure: The particularities of the unlawful acts are contained in Claim 10. Plaintiff relied on defendants' representations through NODs, SOTs, and NOSs that non-judicial foreclosure was not a preempted state law pursuant to 12 CFR § 560.2.

205.    Improper Foreclosure Process: The particularities of the unlawful acts are contained in Claim 11. Plaintiff relied on defendants' signatures and notarizations to establish the legitimacy of the NODs, SOTs, and NOSs that were recorded by defendants.

206.    Violation of 18 USC §1961 et seq.: The particularities of the unlawful acts are contained in Claim 14.

207.    Elder Abuse: The particularities of the unlawful acts are contained in Claim 16.

208.    Violation of TILA. The particularities of the unlawful acts are contained in Claim 17.

209.    WHEREFORE, Plaintiff is entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to defendants because of their unfair, fraudulent, and deceptive acts and/or practices, fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unfair, fraudulent and deceitful activity (amount of restitution to be proven at trial but greater than $76,000 excluding interest and costs).

- 48

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each Defendant, jointly and severally, as follows:

Defendants are guilty of malice, fraud or oppression, as defined in California Civil Code § 3294, and Defendants' actions were malicious and done willfully, in conscious disregard of the rights and safety of Plaintiff, in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover, in addition to actual damages, punitive damages to punish Defendants and to deter future misconduct.

A. For actual damages according to proof;

B. For compensatory damages as permitted by law;

C. For consequential damages as permitted by law;

D. For statutory damages as permitted by law;

E. For punitive damages as permitted by law;

F. For equitable relief, including restitution;

G. For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

H. For interest as permitted by law;

I. For Declaratory Relief;

J. For reasonable fees and costs; and

K. For such other relief as is just and proper.

JURY DEMAND: Plaintiff hereby demands a trial by jury.

By: _Dennly R. Becker_

Dennly R. Becker    June 18, 2012

## VERIFICATION

I, Dennly R. Becker, am the plaintiff in the above-entitled action either as a natural person or as the Trustee and/or Beneficiary of the Becker Trust, dated march 25, 1991. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on June 18, 2012 in Livermore, California.

_Dennly R. Becker_

Dennly R. Becker

DENNLY R. BECKER
PRO PER
5462 BETTY CIRCLE
LIVERMORE, CA 94550
(925)245-1457
FAX: (925)245-0968

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| DENNLY R. BECKER; THE BECKER TRUST DATED MARCH 25, 1991,<br><br>Plaintiff,<br><br>    vs.<br>WELLS FARGO BANK,NA,;WACHOVIA MORTGAGE CORPORATION; DOES 1-20,<br><br>Defendant, | Case No.:2:10-cv-02799-LKK-KJN<br><br>**DECLARATION OF DENNLY R. Becker IN SUPPORT OF THE PROPOSED REVISED THIRD AMENDED COMPLAINT** |

## DECLARATION OF PLAINTIFF
## DENNLY R. BECKER

### A. Plaintiff's Exhibits

1. Exhibit 4 is an Adjustable Rate Mortgage Note for my Shelborne property sent to me on November 5, 2010 by Wachovia Mortgage agent Korey L. Walls, Executive Mortgage Specialist, Office of the President in response to a QWR I sent to Wachovia.

2. Exhibit 5 is a Truth in Lending Disclosure Statement provided to me when I originated the Shelborne loan. The copy provided at origination is a legal size document. My copier will not copy legal size documents so this exhibit is provided in two pages.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and the Exhibits contain true copies of documents that I received.

June 18, 2012

Date

Signature

**WORLD SAVINGS BANK, FSB**

# ADJUSTABLE RATE MORTGAGE NOTE
## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: **0027736420**  DATE: **FEBRUARY 04, 2005**

BORROWER(S): DENNLY R. BECKER, TRUSTEE OF THE BECKER TRUST DATED MARCH 25, 1991.

sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **865 SHELBORNE DRIVE
TRACY, CA 95377**

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$311,500.00 * * * * *** called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, A FEDERAL SAVINGS BANK * * * * * * * * * * * * * * * * * *** ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred.

### 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **5.220% * * * ***. The interest rate I will pay may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the **1ST** day of **APRIL, 2005 * * *** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My lifetime maximum interest rate limit is **12.250%, *** called "Lifetime Rate Cap."



**Exhibit** 4

0027736420

**(D)    Index**
Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the sum currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)    Calculation of Interest Rate Changes**
Lender will calculate my new interest rate by adding    3.200  *  percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)    Alternative Index**
The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3. PAYMENTS**
**(A)    Time and Place of Payments**
I will pay Principal and interest by making payments every month.

I will make my monthly payments on the 1ST   day of each month beginning on   APRIL 01, 2005.   I will make these payments every month until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on   MARCH 01, 2035  *  * , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612  * * * * * * * * * * * * * * * * * *    or at a different place if required by notice from the Lender.

**(B)    Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $1,271.68. * *  This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)    Payment Change Dates**
My monthly payment will change as required by Section 3(D) below beginning on the   1ST  * *    day of APRIL, 2006  * *    and on that day every   12TH    month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)    Calculation of Payment Changes**
Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

Exhibit 4

0027736420

**(E) Deferred Interest; Additions to My Unpaid Principal**
From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F) Limit on My Unpaid Principal, Increased Monthly Payment**
My unpaid principal balance can never exceed 125% * * of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G) Payment Cap Limitation; Exceptions**
Beginning with the 10TH Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H) Notice of Payment Changes**
The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

## 4. FAILURE TO MAKE ADJUSTMENTS

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL BEFORE IT IS DUE IS CALLED A "PREPAYMENT". WHEN I MAKE A PREPAYMENT, I WILL TELL THE LENDER IN WRITING THAT I AM DOING SO. THE LENDER MAY REQUIRE THAT ANY PARTIAL PREPAYMENTS BE MADE ON THE DATE MY REGULARLY SCHEDULED PAYMENTS ARE DUE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATES OR AMOUNT OF MY REGULARLY SCHEDULED PAYMENTS UNLESS THE LENDER AGREES TO THOSE CHANGES IN WRITING. I MAY PAY DEFERRED INTEREST ON THIS NOTE AT ANY TIME WITHOUT CHARGE AND SUCH PAYMENT WILL NOT BE CONSIDERED A "PREPAYMENT" OF PRINCIPAL. DURING THE FIRST 3 YEARS OF THE LOAN TERM IF I MAKE ONE OR MORE PREPAYMENTS THAT, IN THE AGGREGATE, EXCEED $5,000 IN ANY CALENDAR MONTH, I MUST PAY A PREPAYMENT CHARGE EQUAL TO 2% OF THE AMOUNT SUCH PREPAYMENTS EXCEED $5,000 IN THAT CALENDAR MONTH. AFTER THE FIRST 3 YEARS OF THE LOAN TERM, I MAY MAKE A FULL OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## 6. MAXIMUM LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**
If the Lender has not received the full amount of any monthly payment by the end of 10 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 6% * of my overdue payment of Principal and interest. I will pay the late charge promptly but only once on each late payment.

**Exhibit 4**

0027736420

**(B) Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C) Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D) No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E) Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **2750 LA COSTA DRIVE, BRENTWOOD, CA 94513,** * * * * * * * * * * * * * * * * * * or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE — ACCELERATION

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exhibit** 4

0027736420

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i) Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii) Lender approves the creditworthiness of the transferee in writing;

(iii) transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv) an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v) the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

**Exhibit** 4

0027736420

## SIGNATURE PAGE

**NOTICE TO BORROWER(S):**

**BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
DENNLY R. BECKER, TRUSTEE OF THE BECKER
TRUST DATED MARCH 25, 1991.

_____ (Seal)

_____ (Seal)

_____ (Seal)

_____ (Seal)

_____ (Seal)

**Exhibit 4**

# WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
DENNLY R. BECKER, TRUSTEE

Date  02/04/05
Loan No.  0027736420

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total price of your purchase on credit including your down payment of NOT APPLICABLE |
| 5.299% | $325,721.55 | $307,630.95 | $633,352.50 | NOT APPLICABLE |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $  1,271.68 | 04/01/05 |
| 12 | 1,367.05 | 04/01/06 |
| 12 | 1,469.58 | 04/01/07 |
| 12 | 1,579.80 | 04/01/08 |
| 12 | 1,698.28 | 04/01/09 |
| 299 | 1,815.72 | 04/01/10 |
| 1 | 1,815.54 | 03/01/35 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.
This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance:  You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security:  You are giving a security interest in the real property located at  865 SHELBORNE DRIVE, TRACY, CA 95377.

Filing Fees:  $  80.00

**Exhibit 5**

Late Charge:  If a payment is late, you will be charged  6.00 % of the payment.

Prepayment:  If you pay off the loan early, you  MAY  have to pay a penalty and you  WILL NOT  be entitled to a refund of  ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption:  SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS – SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written

**Your payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $ 1,271.68 | 04/01/05 |
| 12 | 1,367.05 | 04/01/06 |
| 12 | 1,469.58 | 04/01/07 |
| 12 | 1,579.80 | 04/01/08 |
| 12 | 1,698.28 | 04/01/09 |
| 299 | 1,815.72 | 04/01/10 |
| 1 | 1,815.54 | 03/01/35 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.
This loan  DOES NOT HAVE A DEMAND FEATURE.

Insurance:   You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security:   You are giving a security interest in the real property located at  865 SHELBORNE DRIVE, TRACY, CA 95377.

Filing Fees:   $   80.00

Late Charge:   If a payment is late, you will be charged   6.00 % of the payment.

Prepayment:   If you pay off the loan early, you   MAY   have to pay a penalty and you   WILL NOT   be entitled to a refund of  ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption:   SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS — SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale:   If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

**Exhibit** 5

DENNLY R. BECKER, TRUSTEE

Date

★ 0 7 3 ★
LENDER'S USE ONLY

GF424A1 (03.15.00/1-00) R24A
FINAL        DISTRIBUTION:   1 COPY-RETURN SIGNED TO LENDER   1 COPY-CUSTOMER   CA 2 COPIES-FILE

# PROOF OF SERVICE

## Case No.: 2:10-CV-02799-LKK-KJN

I, the undersigned, declare that I am over the age of 18 and am not a party to this action.

On the date below, I served a copy of the following document(s) on the interested parties in this action:

NOTICE OF MOTION AND MOTION TO AMEND COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES;
PROPOSED REVISED THIRD AMENDED COMPLAINT;
DECLARATION OF DENNLY R. BECKER
RJN IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION TO
    AMEND COMPLAINT

By placing the original and/or a true copy thereof enclosed in a sealed envelope, addressed as follows:

ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL & TRYTTEN, LLP
199 South Los Robles Avenue, Suite 600
Pasadena, CA 91101-2459
Att: Christopher A. Carr

The above are attorneys for defendants Wells Fargo Bank, N.A. Inc. and Wachovia Mortgage.

I deposited the envelope in a U.S. Postal Service mail box in Livermore, California. The envelope was mailed by priority mail with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in Livermore, California, on June 18, 2012.

Tracey A. Lewis
-----------------------
(Type or Print Name)

(Signature of Declarant)