1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DENNLY BECKER, et al.,                    No.  2:10-cv-2799-TLN-KJN PS

12              Plaintiffs,

13       v.                                    FINDINGS AND RECOMMENDATIONS

14   WELLS FARGO BANK NA, INC., et al.,

15              Defendants.

16

17          Presently before the court is defendants Wells Fargo Bank, N.A., Inc.'s and Wachovia

18   Mortgage Corporation's (collectively, "defendant")[1] motion for summary judgment or, in the

19   alternative, summary adjudication.[2]  (ECF No. 179.)  Plaintiff Dennly Becker ("plaintiff")[3] filed

20   a written opposition to defendant's motion and defendant filed a reply.  (ECF No. 184; ECF No.

---

[1] The evidence in the record reflects that defendant Wachovia Mortgage Company converted to
Wells Fargo Bank Southwest, N.A., which merged into and subsequently operated as part of
defendant Wells Fargo Bank, N.A., Inc. effective November 1, 2009.  (Decl. of Michael Dolan
(ECF No. 179-2) ¶ 2, Exhibit A.)  Accordingly, in recognition of the merger of both defendants in
this case into a single entity, when the court uses the term "defendant" it refers to both Wells
Fargo Bank, N.A., Inc. and Wachovia Mortgage Company as Wells Fargo's predecessor by
merger  unless otherwise specifically noted.

[2] This action proceeds before the undersigned pursuant to Eastern District of California Local
Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

[3] Plaintiff purports to bring this case on his own behalf and behalf of Becker Trust Dated March
25, 1991, of which plaintiff is the sole beneficial owner.  (Third Am. Compl. 1-2.)

1   186.)  The undersigned has fully considered the parties' briefs and appropriate portions of the

2   record.[4]  For the reasons that follow, the undersigned recommends that defendant's motion for

3   summary judgment be granted in full.  Accordingly, the undersigned recommends that judgment

4   be entered in defendant's favor and this case be closed.

5   I.      STANDARDS FOR A MOTION FOR SUMMARY JUDGMENT

6           Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary

7   judgment, identifying each claim or defense--or the part of each claim or defense--on which

8   summary judgment is sought."  It further provides that "[t]he court shall grant summary judgment

9   if the movant shows that there is no genuine dispute as to any material fact and the movant is

10  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[5]  A shifting burden of proof

11  governs motions for summary judgment under Rule 56.  Nursing Home Pension Fund, Local 144

12  v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010).  Under

13  summary judgment practice, the moving party:

14              always bears the initial responsibility of informing the district court
               of the basis for its motion, and identifying those portions of "the
15              pleadings, depositions, answers to interrogatories, and admissions
               on file, together with the affidavits, if any," which it believes
16              demonstrate the absence of a genuine issue of material fact.

17  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

18  56(c)).  "Where the non-moving party bears the burden of proof at trial, the moving party need

19  only prove that there is an absence of evidence to support the non-moving party's case."  In re

20  Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R.

21  Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does

22  not have the trial burden of production may rely on a showing that a party who does have the trial

23  burden cannot produce admissible evidence to carry its burden as to the fact").

24  ////

25  ─────────────────────────
    [4] This motion was submitted on the record and briefs without oral argument pursuant to Local
26  Rule 230(g).

27  [5] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.
    However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he
28  standard for granting summary judgment remains unchanged."

1    If the moving party meets its initial responsibility, the opposing party must establish that a

2  genuine dispute as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith

3  Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary judgment, the opposing party

4  must demonstrate the existence of a factual dispute that is both material, i.e., it affects the

5  outcome of the claim under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S.

6  242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d

7  1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such that a reasonable jury could

8  return a verdict for the nonmoving party,'" FreecycleSunnyvale v. Freecycle Network, 626 F.3d

9  509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248).  A party opposing summary

10  judgment must support the assertion that a genuine dispute of material fact exists by:  "(A) citing

11  to particular parts of materials in the record, including depositions, documents, electronically

12  stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers,

13  or other materials; or (B) showing that the materials cited do not establish the absence or presence

14  of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

15  fact."[6] Fed. R. Civ. P. 56(c)(1)(A)-(B).  However, the opposing party "must show more than the

16  mere existence of a scintilla of evidence."  In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing

17  Anderson, 477 U.S. at 252).

18    In resolving a motion for summary judgment, the evidence of the opposing party is to be

19  believed.  See Anderson, 477 U.S. at 255.  Moreover, all reasonable inferences that may be drawn

20  from the facts placed before the court must be viewed in a light most favorable to the opposing

21  party.  See Matsushita, 475 U.S. at 587; Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963,

22  966 (9th Cir. 2011).  However, to demonstrate a genuine factual dispute, the opposing party

23  "must do more than simply show that there is some metaphysical doubt as to the material facts . .

24  . Where the record taken as a whole could not lead a rational trier of fact to find for the non-

25  moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87 (citation

26

27    [6]  "The court need consider only the cited materials, but it may consider other materials in the
record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to
support or dispute a fact cannot be presented in a form that would be admissible in evidence."
28  Fed. R. Civ. P. 56(c)(2).

1   omitted).

2   II.     DEFENDANT'S EVIDENTIARY OBJECTIONS

3          Plaintiff includes a separate Statement of Disputed Facts ("SDF") in support of his

4   opposition to defendant's motion for summary judgment, in which plaintiff puts forth 194

5   "disputed" facts.  (Pl.'s SDF (ECF No. 184-1).)  Defendant objects to 160 of those facts.  (ECF

6   No. 187.)  For many of plaintiff's facts, defendant objects on multiple grounds.

7          Many of defendant's objections are merely "'boilerplate recitations of evidentiary

8   principles or blanket objections without analysis applied to specific items of evidence.'"

9   Stonefire Grill, Inc. v. FGF Brands, Inc., 2013 WL 6662718, at *4 (C.D. Cal. Aug. 16, 2013);

10  Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  Accordingly, the

11  court declines to scrutinize each of defendant's individual objections or fully analyze identical

12  objections raised as to each fact.  See Mayes v. Kaiser Found. Hospitals, 2014 WL 2506195, at *2

13  (E.D. Cal. June 3, 2014); Stonefire Grill, Inc., 2013 WL 6662718, at *4; Capitol Records, LLC v.

14  BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n. 1 (C.D. Cal. 2010) (quotation omitted) ("In motions

15  for summary judgment with numerous objections, it is often unnecessary and impractical for a

16  court to methodically scrutinize each objection and give a full analysis of each argument

17  raised.").

18         Furthermore, the court will not address any of defendant's numerous relevance objections.

19  Since the court may rely only on relevant evidence in addressing the motion, its citation to

20  evidence subject to a relevance objection means the objection has been overruled.  Mayes v.

21  Kaiser Found. Hospitals, 2014 WL 2506195, at *2 (E.D. Cal. June 3, 2014); Burch v. Regents of

22  Univ. Of Cal., 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) (stating that relevance objections are

23  redundant because a court cannot rely on irrelevant facts in resolving a summary judgment

24  motion); see also Stonefire Grill, Inc., 2013 WL 6662718, at *5.

25  ////

26  ////

27  ////

28  ////

4

1          Similarly, the court will not consider the defendant's objections aimed at the

2    characterization of or purported misstatement of the evidence as represented in plaintiff's

3    Statement of Disputed Facts.[7]  (See, e.g., ECF No. 187 at ¶¶ 5, 11, 46, 81.)  Defendant's

4    "'evidentiary objections' to [plaintiff's] separate statements of [ ]disputed facts are not considered

5    because such objections should be directed at the evidence supporting those statements" rather

6    than the statements themselves.  Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic,

7    Inc., 556 F.Supp.2d 1122, 1126, n.1 (E.D. Cal. 2008); Dalton v. Straumann Co. USA Inc., 2001

8    WL 590038, at *4 (N. D. Cal. May 18, 2001) ("Most of these objections to evidence are actually

9    objections to defendant's characterization of the evidence in its 'Statement of Undisputed Facts.'

10   Plaintiff's counsel objects that statements are vague or compound as if he were objecting to

11   questions asked in a deposition.  But counsel is not objecting to evidence, merely to defendant's

12   characterization of the evidence.").  Accordingly, the court does not consider objections aimed at

13   plaintiff's characterization of the evidence, including that the fact misleads, misstates, or

14   mischaracterizes the evidence.

15         Moreover, the court will resolve other objections only to the extent it finds the disputed

16   evidence has any bearing on the issues before it.  Schwarz v. Lassen Cnty. ex rel. the Lassen Cnty

17   Jail, 2013 WL 5425102, at *13 (E.D. Cal. Sep. 27, 2013) (stating that extensive evidentiary

18   objections undercut the goals of judicial efficiency and avoiding costly litigation).  Therefore, for

19   purposes of ruling on this motion for summary judgment, the court addresses only objections to

20   evidence actually relied on by the court.  The court declines to address any remaining evidentiary

21   objections.  "A trial court can only consider admissible evidence in ruling on a motion for

22   summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).  To

23   the extent that the court relies on objected-to evidence, it relies only on admissible evidence and,

24   therefore, the objections to such evidence are overruled.

25   ////

26   ————————————————————

27   [7] Plaintiff makes similar objections to the characterization of or purported misstatement of the
     evidence as represented in defendant's Statement of Undisputed Facts ("SUF").  (See, e.g., Pl.'s
     Rebuttal to Def.'s SUF (ECF No. 184-2) at ¶¶ 21, 48.)  The court also will not consider these

28   objections for the same reasons it will not consider such objections by defendant.

1    III.    UNDISPUTED FACTS

2            Unless otherwise noted by the court that the parties disagree upon a particular fact, all

3    facts referred to below are undisputed by the parties. The court attempts to not cite to any facts

4    that are irrelevant to resolution of the pending motion.

5            Plaintiff lives at and owns both 5462 Betty Circle in Livermore, California and 604 Hardy

6    Place in Lincoln, California.  (Defendant's Statement of Undisputed Facts ("Def.'s SUF") ¶ 1;

7    Declaration of David Newman ("Newman Decl.") ¶ 2, Exhibit 1 (Deposition of Dennly Becker)

8    at 37:1-21, 42:24-43:9).)  Plaintiff also owns sixteen rental properties in California, all of which

9    he uses for investment purposes.  (Def.'s SUF ¶ 2; Newman Decl. ¶ 2, Exhibit 1 at 43:18-19,

10   45:13-20.)  The present litigation concerns nine of those sixteen investment properties.  (Def.'s

11   SUF ¶ 4.)

12           Plaintiff purchased the nine investment properties between 2000 and 2005 and financed

13   the purchase of each property with a loan from World Savings Bank, FSB.  (Def.'s SUF ¶ 5;

14   Decl. of Michael Dolan ("Dolan Decl.") (ECF No. 179-2) ¶ 14, Exhibits B-J.)  In January of 2008

15   World Savings Bank, FSB changed its name to Wachovia Mortgage.  (Def.'s SUF ¶ 6; Dolan

16   Decl. ¶ 2.)  Wachovia Mortgage later underwent a second name change to Wells Fargo Bank

17   Southwest N.A. before merging with Wells Fargo Bank, N.A. in November of 2009.[8]  (Def.'s

18   SUF ¶ 6; Dolan Decl. ¶ 2.)

19           The loans for each of plaintiff's nine investment properties are memorialized by written

20   promissory notes and are secured by recorded deeds of trust.  (Def.'s SUF ¶ 7; Newman Decl. ¶ 2,

21   Exhibit 1 at 45:7-9; Dolan Decl. ¶ 14, Exhibits B-J.)  Plaintiff's payments on these loans are

22   current with respect to six of these properties.  (Def.'s SUF ¶ 8; Newman Decl. ¶ 2, Exhibit 1 at

23   51:22-52:6.)  However, plaintiff is in default for the loans on the remaining three properties, the

24   _____

25   [8] Plaintiff contends that, instead of a merger taking place, Wells Fargo, N.A. acquired Wells
     Fargo Bank Southwest, N.A.  (Pl.'s Rebuttal to Def.'s SUF ¶ 6.)  However, plaintiff fails to
26   include in his exhibits the portion of Michael Dolan's Deposition that plaintiff relies on in support
     of this contention.  The part of the deposition that plaintiff does include does not support
27   plaintiff's assertion.  (See Declaration of Dennly Becker ("Becker Decl."), ECF No. 185, at ¶ 3,
     Exhibit 2 (Dolan Decl. 87:1-7).)  Furthermore, plaintiff's claimed distinction is of no
28   consequence for purposes of the present motion.

first located at 865 Shelborne Drive in Tracy, California ("Shelborne Property"), the second located at 2416 Third Street in Lincoln, California ("Third Street Property"), and the third located at 1895 Larkflower Way in Lincoln, California ("Larkflower Property").  (Def.'s SUF ¶ 9; Newman Decl. ¶ 2, Exhibit 1 at 52:7-21.)  Plaintiff defaulted on the loan for the Shelborne Property on October 1, 2009.  (Def.'s SUF ¶ 10; Newman Decl. ¶ 2, Exhibit 1 at 52:22-53:4.) This default resulted in a decrease to plaintiff's credit score.  (Def.'s SUF ¶ 11; Newman Decl. ¶ 2, Exhibit 1 at 166:8-22.)[9]  Plaintiff defaulted on the loans for the Larkflower Property and the Third Street Property in April of 2010.  (Def.'s SUF ¶ 12; Newman Decl. ¶ 2, Exhibit 1 at 100:13-17, 100:25-101:3.)

In August of 2008, prior to any loan defaults, plaintiff requested that Wells Fargo modify the terms of his loans on his investment properties; plaintiff was told at that time that there were no modification options for non-owner occupied investment properties.  (Def.'s SUF ¶ 13; Newman Decl. ¶ 4, Exhibit 3 at ¶ 1.)   Plaintiff made no further attempts to modify the terms of any of the loans on his nine investment properties until after he had defaulted on the Shelborne Property loan more than one year later.  (Def.'s SUF ¶ 14; Newman Decl. ¶ 2, Exhibit 1 at 62:11-15.)  Plaintiff had enough funds to make payments on the three defaulted loans, but made a business decision to default. (Def.'s SUF ¶ 15; Newman Decl. ¶ 2, Exhibit 1 at 64:2-9, 65:1-3, 100:25-101:12.)

On November 4, 2009, after plaintiff defaulted on the loan for the Shelborne Property, plaintiff telephoned defendant and communicated with a representative regarding the possibility of a loan modification for the loans on his rental properties.  (Def.'s SUF ¶ 25; Newman Decl. ¶ 2, Exhibit 1 at 70:21-25, 76:19-23.)  During this conversation, plaintiff verbally provided

---

[9] Plaintiff disputes this fact because "[a]lthough [plaintiff] defaulted on the Shelborne loan, the reason his credit report decreased is because Wachovia reported the default to the credit bureaus while at the same time . . . promis[ing] to quickly modify [plaintiff's] Shelborne loan."  (Pl.'s Rebuttal to Def.'s SUF ¶ 11.)  However, plaintiff's explanation shows that plaintiff does not actually dispute defendant's stated fact that the default on the Shelborne Property loan is what caused the decrease in plaintiff's credit report.  Rather, plaintiff seeks to clarify that the credit bureaus became aware of the default because Wachovia reported it to them during the time it was working with plaintiff during the loan modification process for the Shelborne Property loan and purportedly promised to quickly modify that loan.

1    defendant's representative his financial information and the two discussed the possibility of a loan

2    modification.  Defendant's representative told plaintiff that the computer showed that plaintiff

3    would be eligible for a loan modification and that if plaintiff provided defendant with

4    documentation of the financial information he had just verbally provided, he would receive such a

5    modification.  (Newman Decl. ¶ 2, Exhibit 1 at 74:12-25; Becker Decl. ¶ 2, Exhibit 1 at 75:1-21,

6    96:2-23, 131:13-132:5.)  Defendant's representative also determined that plaintiff did not qualify

7    for the federal Home Affordable Modification Program ("HAMP").  (Def.'s SUF ¶ 26; Dolan

8    Decl. ¶ 16, Exhibit K at 239.)

9         On or about November 21, 2009, plaintiff received nine letters from defendant all dated

10   November 18, 2009; each letter corresponded to one of the loans for plaintiff's nine investment

11   properties and each letter stated that defendant was unable to modify plaintiff's loans under

12   HAMP.  (Def.'s SUF ¶ 31; Newman Decl. ¶ 2, Exhibit 1 at 79:8-80:1, Exhibit 5; Newman Decl. ¶

13   4, Exhibit 3 (Pl.'s Responses to Def.'s First Set of Interrogatories) at ¶ 6.)  In the time between

14   the November 4, 2009 phone call and receiving the November 18, 2009 letters, plaintiff received

15   nothing in writing confirming that he would receive a modification for any of his loans.  (Def.'s

16   SUF ¶ 29; Newman Decl. ¶ 2, Exhibit 1 at 79:8-80:5.)  Within the same timeframe, plaintiff did

17   not make any adverse changes to his financial situation.  (Def.'s SUF ¶ 32; Newman Decl. ¶ 2,

18   Exhibit 1 at 81:9-82:23.)

19        On or about November 24, 2009, plaintiff received additional letters from defendant dated

20   November 19, 2009, stating that plaintiff's request for a modification on his loans for several of

21   his properties, including the Larkfower Property and Third Street Property, were denied because

22   of something in his credit report.  (Def.'s SUF ¶ 33; Newman Decl. ¶ 2, Exhibit 1 at 82:24-83:9;

23   Newman Decl. ¶ 4, Exhibit 3 at ¶ 8.)  On or about December 1, 2009, plaintiff received a similar

24   letter concerning the loan for the Shelborne Property.  (Def.'s SUF ¶ 33, Newman Decl. ¶ 2,

25   Exhibit 1 at 82:24-83:9; Newman Decl. ¶ 4, Exhibit 3 at ¶ 9.)  On December 3, 2009, plaintiff

26   received a letter from defendant stating that the loan on the Shelborne Property had been

27   approved for foreclosure.  (Newman Decl. ¶ 2, Exhibit 1 at 83:7-9.)  On December 7, 2009,

28   plaintiff sent defendant a fax asking defendant to work with him.  (Becker Decl. ¶ 12, Exhibit 13.)

By December 12, 2009, plaintiff had withdrawn his requests for loan modifications for all of the loans on his investment properties except for the loan on the Shelborne Property, for which plaintiff continued his efforts to obtain a modification.  (Def.'s SUF ¶ 34; Pl.'s SDF ¶ 21; Newman Decl. ¶ 4, Exhibit 3 at ¶ 13.)  On December 16, 2009, plaintiff engaged in a phone conversation with Teo, one of defendant's agents.  (Newman Decl. ¶ 2, Exhibit 1 at 88:12-14; Dolan Decl. ¶ 16, Exhibit K.)  During this conversation Teo advised plaintiff that plaintiff's application for a loan modification under defendant's in-house loan modification program, MAP, could not be approved because the income information he had submitted showed that his income was too low.  (Def.'s SUF ¶ 34; Pl.'s SDF ¶ 22; Newman Decl. ¶ 2, Exhibit 1 at 88:12-21; Dolan Decl. ¶ 16, Exhibit K.)  Plaintiff then told Teo that he could take money out of his Individual Retirement Account ("IRA") and asked Teo if a withdrawal of $2,000 per month would be adequate to make up for plaintiff's stated income being too low.  (Def.'s SUF ¶ 37; Pl.'s SDF ¶ 22; Newman Decl. ¶ 2, Exhibit 1 at 89:5-9; Newman Decl. ¶ 4, Exhibit 3 at ¶ 15.)  Teo replied by stating that an additional $2,000 per month would make the difference and encouraged plaintiff to make the IRA withdrawals and reapply for a modification when he had proof of the additional income; however, Teo did not specifically guarantee that plaintiff would receive a loan modification.  (Newman Decl. ¶ 2, Exhibit 1 at 89:5-10, 94:8-95:5, 95:14-17; Newman Decl. ¶ 4, Exhibit 3 at ¶ 15.)  Plaintiff took Teo's statements to mean that if he had an additional $2,000 in monthly income, then he would get the loan modification.  (Newman Decl. ¶ 2, Exhibit 1 at 94:8-95:5.)  Defendant never provided plaintiff with anything in writing stating that plaintiff's withdrawals from his IRA would guarantee a loan modification.  (Def.'s SUF ¶ 39; Newman Decl. ¶ 2, Exhibit 1 at 4-17.)

On December 21, 2009, plaintiff talked with "LVZ", another of defendant's agents.  (Dolan Decl. Exhibit K at 236.)  During this conversation, plaintiff informed LVZ that his income would increase by $2,000 per month beginning in January and LVZ advised plaintiff that he would need to submit all documents reflecting this increase so that defendant could reply regarding its MAP modification program.  (Id.)  On that same day, after the conversation, plaintiff submitted an application to withdraw $2,000 per month from his Fidelity IRA to be deposited into

1  his credit union account beginning in January 2010, from which plaintiff could withdraw the

2  funds to make his loan payments for any his loans, including the ones not in default.  (Pl.'s SDF ¶

3  26; Def.'s SUF ¶ 41; Newman Decl. ¶ 2, Exhibit 1at 118:18-119:10.)  Around this time,

4  plaintiff's investments in his IRA were not returning any income.  (Def.'s SUF ¶ 44, Third

5  Amended Compl. ¶ 62.)  In subsequent months, plaintiff also indicated to the foreclosure trustee

6  that he was planning on pulling money out of his IRA in order to pay off his three loans that were

7  in foreclosure.  (Def.'s SUF ¶ 43; Newman Decl. ¶ 2, Exhibit 1 at 186:14-17.)  Plaintiff continued

8  to make withdrawals of funds from his IRA for the next fourteen months, until early 2011,

9  resulting in a total withdrawal of $28,000.  (Def.'s SUF ¶¶ 43, 59; Newman Decl. ¶ 2, Exhibit 1 at

10  118:12-119:10.)

11        Between January 2010 and August 2010, plaintiff continued to communicate with

12  defendant's representatives via phone and by submitting documents requested by defendant in an

13  attempt to secure a loan modification.  (Def.'s SUF ¶ 47; Newman Decl. ¶ 2, Exhibit 1 at 95:18-

14  25, Dolan Decl. ¶¶ 18-21, Exhibits L-N.)  Defendant claims that it repeatedly indicated to

15  plaintiff during this timeframe that additional documents would be needed before defendant could

16  process plaintiff's modification application.  (Def.'s SUF ¶ 47; Dolan Decl. ¶¶ 18-21, Exhibits L-

17  N.)  Plaintiff disputes this claim and asserts that defendant's representatives repeatedly told him

18  that he was missing documentation that he had already sent in or that additional documentation

19  would be necessary to process his loan modification application when they already had all of the

20  required documentation to process his application.  (See, e.g., Pl.'s SDF ¶¶ 31-41, 47-50, 52-58,

21  62-64.)  Also during this time span, defendant sent plaintiff several letters concerning his requests

22  for a loan modification; three of the letters stated that plaintiff was denied under HAMP, and the

23  other stated that plaintiff was denied under MAP for "Excessive Financial Obligations."  (Def.'s

24  SUF ¶ 48; Newman Decl. ¶ 2, Exhibit 1 at 106:12-25; Newman Decl. ¶ 4, Exhibit 3 at ¶¶ 65, 80,

25  123, 136.)

26  ////

27  ////

28  ////

10

On March 10, 2010, Citibank sent a letter to plaintiff stating that it was suspending his Home Equity Line of Credit because delinquent credit obligations appearing on plaintiff's credit report, the delinquent credit obligation being plaintiff's default on the Shelborne Property loan. (Pl's SDF ¶ 51; Def.'s SUF ¶¶ 19-20; Becker Decl. ¶ 28, Exhibit 29; Newman Decl. ¶ 2, Exhibit 1 at 160:7-16.)

On or about April 26, 2010, plaintiff received from defendant a forbearance agreement for the loan on the Shelborne Property, which was sent to plaintiff in order to determine his willingness to make monthly mortgage payments on his loan and required plaintiff to make three monthly payments in conformity with the terms of the agreement. (Def.'s SUF ¶ 52; Newman Decl. ¶ 2, Exhibit 1 at 107:19-25, Exhibit 8; Dolan Decl.¶ 22, Exhibit O.) The forbearance agreement permitted plaintiff to apply for a permanent modification of the loan after all three payments had been made, but also required that plaintiff provide further documentation of his financial information showing he qualified for such a modification. (Def.'s SUF ¶ 54; Dolan Decl. ¶ 27, Exhibit S.) Plaintiff signed and returned the forbearance agreement on May 6, 2010. (Def.'s SUF ¶ 53; Newman Decl. ¶ 2, Exhibit 1at 109:12-14.) Plaintiff made all three payments listed in the forbearance agreement. (Def.'s SUF ¶ 55; Newman Decl. ¶ 2, Exhibit 1at 115:9-10.) After plaintiff made his last payment under the forbearance agreement, he continued his efforts to obtain a loan modification, but received another denial letter on August 17, 2010. (Def.'s SUF ¶ 57; Newman Decl. ¶ 2, Exhibit 1at 115:19-116:6; Newman Decl. ¶ 4, Exhibit 3 at ¶ 135; Dolan Decl. ¶ 24, Exhibit R.) After this denial, plaintiff filed the present lawsuit in the San Joaquin County Superior Court on September 16, 2010. (Newman Decl. ¶ 2, Exhibit 1at 166:7-17.)

A Notice of Default ("NOD") was posted on the Third Street Property and recorded with the Placer County Recorder's Office on September 23, 2010. (Def.'s SUF ¶ 67; Newman Decl. ¶ 2, Exhibit 1 at 153:11-18; Dolan Decl. ¶ 29, Exhibit U.) A NOD was posted on the Shelborne Property and recorded with the San Joaquin County Recorder's Office on September 30, 2010. (Def.'s SUF ¶ 67; Newman Decl. ¶ 2, Exhibit 1 at 153:11-18; Dolan Decl. ¶ 28, Exhibit T.) A NOD was posted on the Larkflower Property and recorded with the Placer County Recorder's Office on October 4, 2010. (Def.'s SUF ¶ 67; Newman Decl. ¶ 2, Exhibit 1 at 153:11-18; Dolan

Decl. ¶ 30, Exhibit V.)  After the NODs were posted on these three properties, plaintiff spoke with some of the tenants residing on the properties regarding the notices, but plaintiff did not contest the fact that he had defaulted on the loans for these three properties.  (Def.'s SUF ¶ 68; Newman Decl. ¶ 2, Exhibit 1 at 29:3-15.)

In October of 2010, plaintiff sent several letters to defendant requesting information and documentation concerning his three defaulted loans.  (Def.'s SUF ¶ 62; Newman Decl. ¶ 2, Exhibit 1 at 168:7-17, 174:8-16, 183:22-184:2, Exhibits 14, 18, 27.)  In December of 2010 and June of 2011, plaintiff sent further letters to defendant requesting information and documentation concerning the loans on plaintiff's six investment properties that he had not defaulted on; these two letters contained substantively the same information.  (Def.'s SUF ¶¶ 63-64; Newman Decl. ¶ 2, Exhibit 1 at 213:23-214:9, 221:2-15, 222:4-11, Exhibits 36, 38.)  On November 16, 2010, plaintiff sent a letter requested information to Cal-Western Reconveyance Corporation ("Cal-Western"), which had provided a payoff quote to plaintiff and was the trustee for plaintiff's loans; plaintiff did not dispute the amounts listed in the quote.  (Def.'s SUF ¶ 65; Newman Decl. ¶ 2, Exhibit 1 at 201:14-202:12, Exhibit 33.)  Part of plaintiff's purpose behind sending all of these letters was to determine how much money would be required to pay off the three loans on which plaintiff had defaulted.  (Def.'s SUF ¶ 66; Newman Decl. ¶ 2, Exhibit 1 at 208:4-16, 211:16-212:2.)

On December 14, 2010, plaintiff obtained a preliminary injunction enjoining the foreclosure process for the three properties on which plaintiff had defaulted.  (Def.'s SUF ¶ 69; Order Granting Pl.'s Mot. for Preliminary Injunction, ECF 21.)  On or about December 28, 2010, Cal-Western recorded a Notice of Trustee's Sale ("NOTS") for the Third Street Property, which listed the amount of outstanding debt plaintiff owed on the loan for this property. (Def.'s SUF ¶ 70; Dolan Decl. ¶ 31, Exhibit W.)  On or about January 14, 2011, Cal-Western recorded a document entitled "Notice of Withdrawal of Notice of Trustee's Sale" regarding the Third Street Property.  (Def.'s SUF ¶ 71; Dolan Decl. ¶ 32, Exhibit X.)  On April 16, 2012, Cal-Western recorded a NOTS  for the Shelborne Property, which listed the amount of outstanding debt

1   plaintiff owed on the loan for this property.[10] (Def.'s SUF ¶ 72; Dolan Decl. ¶ 33, Exhibit Y.)  On

2   May 2, 2012, Cal-Western recorded a document entitled "Notice of Withdrawal of Notice of

3   Trustee's Sale" regarding the Shelborne Property.  (Def.'s SUF ¶ 73; Dolan Decl. ¶ 34, Exhibit

4   Z.)  Plaintiff did not see the NOTSs posted on either of these two properties.  (Def.'s SUF ¶ 74;

5   Newman Decl. ¶ 2, Exhibit 1 at 243:24-244:3, 244:24-245:5, 253:3-7, 20-24, 256:1-4.)  Plaintiff

6   first learned of both NOTSs when tenants residing at the respective properties called plaintiff and

7   told him about the posted NOTSs and then handed the NOTSs to plaintiff after he came to the

8   properties to inspect.  (Def.'s SUF ¶ 76; Newman Decl. ¶ 2, Exhibit 1 at 244:4-15, 254:1-10.)

9   IV.   DISCUSSION

10          Plaintiff asserts the following nine claims in the Third Amended Complaint: (1) fraud; (2)

11   promissory estoppel; (3) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12

12   U.S.C. §§ 2605 et seq.; (4) defamation; (5) intentional infliction of emotional distress; (6)

13   negligence; (7) negligent infliction of emotional distress; (8) violation of the Racketeer

14   Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 et seq.; and (9) violation

15   of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.[11]

16   (Third Am. Compl. (ECF No. 98).)  Defendant argues that it is entitled to summary judgment as a

17   matter of law as to each of plaintiff's nine claims because the evidentiary record shows that there

18   is no genuine issue of material fact as to any of them.  The court agrees with defendant and finds

19   that summary judgment should be granted in defendant's favor for the reasons set forth below.

20   _____

21   [10] Plaintiff contests that the total amount owed listed on the NOTSs for the Third Street Property
     and the Shelborne Property were incorrect because both incorrectly included the costs and

22   expenses that would be incurred for a trustee's sale, in addition to other fees.  (Pl.'s Rebuttal to
     Def.'s SUF, ECF No. 184-2, at ¶¶ 70, 72.)  Plaintiff argues that the inclusion of such expenses

23   was improper because no trustee's sale has occurred for either property and because plaintiff has
     paid or contested certain fees since the posting of the NOTSs.  (Id.)  For the reasons discussed

24   below, plaintiff's factual contention is inconsequential because it does not give rise to a genuine
     dispute of material fact with regard to any of plaintiff's claims concerning the posting and

25   recording of the NOTSs.

26   [11] Plaintiff's Third Amended Complaint originally contained 14 separate claims; however, several

27   of plaintiff's claims have already been dismissed pursuant to a prior court order.  (ECF No. 115;
     ECF No. 123.)  The earlier order also limited the scope of several of plaintiff's remaining claims

28   addressed herein.  (Id.)

1        A.     Fraud

2        The elements of a California fraud claim are: (1) misrepresentation (false representation,

3 concealment or nondisclosure); (2) knowledge of the falsity (or "scienter"); (3) intent to defraud,

4 i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. Lazar v. Superior Court,

5 12 Cal.4th 631, 638 (1996). "[T]o establish a cause of action for fraud a plaintiff must plead and

6 prove in full, factually and specifically, all of the elements of the cause of action." Conrad v.

7 Bank of America, 45 Cal.App.4th 133, 156 (1996). There must be a showing "that the defendant

8 thereby intended to induce the plaintiff to act to his detriment in reliance upon the false

9 representation" and "that the plaintiff actually and justifiably relied upon the defendant's

10 misrepresentation in acting to his detriment." Id. at 157. "The absence of any one of these

11 required elements will preclude recovery." Wilhelm v. Pray, Price, Williams & Russell, 186

12 Cal.App.3d 1324, 1332 (1986).

13        Defendant argues that summary judgment in its favor is warranted on plaintiff's fraud

14 claim because (1) plaintiff's claim sounds in contract rather than in tort, (2) the evidence shows

15 that defendant's agents made no misrepresentation of fact, and (3) the evidence shows that

16 plaintiff did not suffer the harms alleged in the Third Amended Complaint by detrimentally

17 relying on defendant's allegedly fraudulent statements. (ECF No. 179 at 20.) The court finds

18 defendant's third argument persuasive.[12]

19        In the Third Amended Complaint, plaintiff alleges that he relied on defendant's statements

20 to his detriment, which caused him to suffer the following damages: (1) the suspension of a home

21 equity line of credit ("HELOC") that plaintiff held with Citibank; (2) the loss of loan payments

22 made under the forbearance agreement plaintiff entered into with defendant; and (3) the loss of

23 tax deferred income resulting from plaintiff's withdrawals from his IRA. (Third Am. Compl. ¶¶

24 26-43.) Defendant argues that there is a lack of evidence that each of these items of damages was

25 caused by defendant's alleged misrepresentations made during the loan modification process.

26

27   [12] Because the court finds that summary judgment in defendant's favor is warranted on this claim based solely on defendant's third argument, it is not necessary for the court to address defendant's

28 two other contentions. Accordingly, the court declines to consider these additional arguments.

1    The court agrees.

2         "'A plaintiff asserting fraud by misrepresentation is obliged to . . . 'establish a complete

3    causal relationship' between the alleged misrepresentations and the harm claimed to have resulted

4    therefrom.'"  Rossberg v. Bank of Am., N.A., 219 Cal. App. 4th 1481, 1499 (2013) (quoting

5    Beckwith v. Dahl, 205 Cal.App.4th 1039, 1062 (2012)).  "Indeed, '[a]ssuming . . . a claimant's

6    reliance on the actionable misrepresentation, no liability attaches if the damages sustained were

7    otherwise inevitable or due to *unrelated causes*.'  If the defrauded plaintiff would have suffered

8    the alleged damage even in the absence of the fraudulent inducement, causation *cannot* be alleged

9    and a fraud cause of action cannot be sustained.'"  Rossberg, 219 Cal. App. 4th at 1499 (citations

10   omitted) (emphasis in original).  In other words, a plaintiff "must show a cause and effect

11   relationship between the fraud and damages sought; otherwise no cause of action is stated."  Nagy

12   v. Nagy, 210 Cal. App. 3d 1262, 1269 (1989) (citing Zumbrun v. University of Southern

13   California, 25 Cal.App.3d 1, 12 (1972)).  Furthermore, "'[t]he harm suffered must be one which

14   the defendant must reasonably have contemplated when making fraudulent statements.'"  Alimena

15   v. Vericrest Fin., Inc., 964 F. Supp. 2d 1200, 1213 (E.D. Cal. 2013) (quoting O'Hara v. Western

16   Seven Trees Corp., 75 Cal.App.3d 798, 142 (1977)).

17              1.    HELOC Suspension

18         Plaintiff claims that defendant's misrepresentations caused Citibank to suspend plaintiff's

19   HELOC due to the existence of delinquent credit obligations that appeared on plaintiff's credit

20   report.  Plaintiff argues in his opposition that had defendant processed plaintiff's loan

21   modification request quickly instead of merely misrepresenting that it would, plaintiff would have

22   resumed making payments on his loan for the Shelborne Property under the modified terms and

23   his credit report that Citibank relied on in suspending plaintiff's HELOC would not have shown

24   that plaintiff was delinquent on his loan.  (ECF No. 184 at 30-31.)  However, plaintiff provides no

25   evidence that Citibank would not have suspended his HELOC absent defendant's alleged

26   misrepresentations.  Both plaintiff and defendant agree that the only evidence of a delinquent

27   credit obligation in plaintiff's credit report that Citibank could have relied on to justify its

28   suspension of plaintiff's HELOC on March 10, 2010, was plaintiff's default on his loan for the

1   Shelborne Property because plaintiff did not default on the loans for the Third Street Property and

2   the Larkflower Property until after that date and did not have any other negative credit history in

3   his credit report.  (ECF No. 179 at 23-24; ECF No. 184 at 30.)  However, plaintiff provides no

4   evidence that the suspension of plaintiff's HELOC would not have occurred if defendant had

5   granted plaintiff a loan modification prior to March 10, 2010, and had plaintiff resumed making

6   his monthly payments on the loan for the Shelborne Property.  Plaintiff points to no evidence

7   showing that had defendant quickly provided plaintiff a loan modification after he filed his

8   application materials, plaintiff's default on the Shelborne Property loan would not have still

9   shown up on the credit report Citibank used to suspend plaintiff's HELOC or that Citibank would

10  have ignored the missed payments noted in the credit report in light of the fact that plaintiff had

11  resumed payments on the loan and therefore would decide to not suspend plaintiff's HELOC.

12  Accordingly, plaintiff provides no evidence showing that he would not have suffered the alleged

13  damage in the absence of the alleged fraudulent statements.  See Rossberg, 219 Cal. App. 4th at

14  1499.

15          Moreover, plaintiff's default on the loan for the Shelborne Property occurred on October

16  1, 2009, over a month prior to defendant making the first alleged fraudulent statement.  If

17  Citibank relied on the fact that plaintiff's credit report showed that he had defaulted on the

18  Shelborne Property loan to justify a suspension of the HELOC, then the suspension was caused

19  by plaintiff's default on the loan, which plaintiff decided to allow as a business decision, not

20  defendant's misrepresentations.[13]  Because the undisputed facts show that the suspension of

21  plaintiff's HELOC resulted from events that occurred prior to and independent of defendant's

---

[13] Plaintiff argues in his rebuttal to defendant's Statement of Undisputed Facts that the reason his
credit score decreased was because Wachovia had reported his default on the Shelborne Property
loan during the time it was working with plaintiff regarding a modification for that loan.  (Pl.'s
Rebuttal to Def.'s SUF ¶ 11.)  However, this assertion does not alter the fact that the undisputed
facts show that the delinquent credit obligation that appeared on this report was ultimately due to
plaintiff's default on the Shelborne Property loan.  Moreover, plaintiff does not allege in the Third
Amended Complaint that Wachovia's reporting of his default was somehow fraudulent or
otherwise wrongful.  Accordingly, plaintiff cannot now attempt to advance such a theory for the
first time on summary judgment.  Wasco Prods., Inc., v. Southwall Techs., Inc., 435 F.3d 989,
992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out
inadequate pleadings." (citation and internal quotation marks omitted)).

1    alleged misrepresentations, plaintiff cannot base his claim for fraud on a theory that the

2    suspension of his HELOC was caused by his detrimental reliance on defendant's fraudulent

3    statements.  See Rossberg, 219 Cal. App. 4th at 1499 ("[N]o liability attaches if the damages

4    sustained were otherwise inevitable or due to *unrelated causes*." (emphasis in original)).

5              2.       Loss of Forbearance Payments

6          Similarly, plaintiff provides no evidence to show that defendant's alleged fraudulent

7    statements led to plaintiff losing his payments made under the forbearance agreement he entered

8    into with defendant concerning his loan for the Shelborne Property.  Plaintiff alleges in the Third

9    Amended Complaint and argues in his opposition that he made payments pursuant to the

10   forbearance agreement, but that those payments were not applied to the outstanding balance on

11   the loan for the Shelborne Property.  (Third Am. Compl. ¶ 43; ECF No. 184 at 31.)  The only

12   evidence plaintiff cites to in support of this argument is a copy of a reinstatement quote sent to

13   plaintiff by defendant dated November 16, 2010, that includes a breakdown of the total amount

14   due that would be required to reinstate the loan on the Shelborne Property from foreclosure status.

15   (Becker Decl. ¶ 2, Deposition of Dennly Becker, Exhibit 33.)  However, this document, without

16   more, does not indicate that plaintiff's payments made under the forbearance agreement were not

17   applied towards the loan.

18         Plaintiff provides no other admissible evidence clarifying that this document shows that

19   plaintiff's payments were not credited towards the loan.  Plaintiff only provides his own

20   unsubstantiated guesswork in his Statement of Disputed Facts that this document shows that his

21   payments were not credited.  (Pl.'s SDF ¶¶ 183, 184.)  This guesswork is insufficient to create a

22   genuine issue of material fact with regard to whether plaintiff suffered this alleged injury.  See

23   Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the

24   plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

25   find for the plaintiff.").  The only other evidence in the record with regard to this alleged item of

26   damages is the declaration by Michael Dolan, which states that plaintiff's payments were in fact

27   credited to the amount due on the loan and provides a discussion of how those payments were

28   applied.  (Dolan Decl. ¶¶ 27, 28.)  Accordingly, the evidence in the record does not support

17

1    plaintiff's contention that his forbearance payments were not credited towards his loan.

2           Moreover, insofar as plaintiff premises his cause of action for fraud on a claim that he

3    suffered a loss by not having his payments made pursuant to the forbearance agreement properly

4    credited towards payment of the Shelborne loan, such a claim sounds in breach of contract, not

5    fraud, because the claimed harm, defendant's failure to credit plaintiff's payments towards the

6    amount due on the loan, would have resulted in a breach of the terms of the forbearance

7    agreement.  See Sholiay v. Fed. Nat. Mortgage Ass'n, 2013 WL 5569988 (E.D. Cal. Oct. 9, 2013)

8    (dismissing plaintiff borrower's claim for fraud based on the defendant bank's failure to extend

9    the plaintiff a loan modification or to forego a trustee's sale despite its representations that it

10   would do so because the plaintiff's claim for fraud "amount[ed] to nothing more than a failure to

11   perform a promise contained in a contract."); Morgan v. Aurora Loan Servs., LLC, 2013 WL

12   3448552, at *6 n.6 (C.D. Cal. July 9, 2013) (stating as additional grounds for dismissal the fact

13   that plaintiff's fraud claim was barred under the economic loss rule, which "generally bars tort

14   claims for contract breaches, thereby limiting contracting parties to contract damages," because

15   plaintiff's claim was subsumed by the terms of her foreclosure alternative agreement with the

16   bank).  Therefore, even assuming, *arguendo*, that defendant did not properly credit plaintiff's

17   forbearance payments, such an item of damages cannot form the basis of plaintiff's fraud claim

18   because defendant's actions would have amounted to nothing more than a failure to perform a

19   promise contained in the forbearance agreement between the parties.[14]

20   ////

21

22   [14] Plaintiff also argues for the first time in his opposition that defendant committed fraud by
     having plaintiff enter into the forbearance agreement for the Shelborne Property loan because
23   plaintiff "was only interested in the option to apply for a permanent loan modification" and
     defendant "knew [it] did not have modification programs for non-owner occupied properties
24   when [plaintiff] signed the agreement."  (ECF No. 184 at 31.)  However, plaintiff does not allege
     this theory in the Third Amended Complaint.  "[W]here . . . the complaint does not include the
25   necessary factual allegations . . . , raising such a claim in a summary judgment motion is
     insufficient to present the claim to the district court."  Navajo Nation v. U.S. Forest Serv., 535
26   F.3d 1058, 1080 (9th Cir. 2008); see also Wasco Prods., Inc, 435 F.3d at 992 ("[S]ummary
     judgment is not a procedural second chance to flesh out inadequate pleadings." (citation and
27   internal quotation marks omitted)).  Accordingly, plaintiff cannot now base his claim for fraud on
     these new factual allegations.
28

                                                  18

3.      <u>Loss of Tax-Deferred Income</u>

Plaintiff claims that he detrimentally relied on defendant's agent Teo's purportedly fraudulent statement that a monthly withdrawal of $2,000 by plaintiff from his IRA would make the difference in making plaintiff eligible for a loan modification when he began withdrawing $2,000 per month from his IRA account.  Plaintiff argues that defendant's misrepresentation caused financial harm to plaintiff because if plaintiff had not been induced into withdrawing funds from his account before he otherwise would have, the funds removed in reliance on defendant's representation would have increased in value as the stock market recovered between the time he made the initial withdrawal and the present, ultimately generating a profit for plaintiff. (ECF No. 184 at 31.)  However, "'[t]he harm suffered must be one which the defendant must reasonably have contemplated when making fraudulent statements.'" <u>Alimena</u>, 964 F. Supp. 2d at 1213 (quoting <u>O'Hara</u>, 75 Cal.App.3d  at 142).  The undisputed facts show that plaintiff's investments in his IRA were not returning any income when he withdrew funds from the account. (Def.'s SUF ¶ 44; Third Amended Compl. ¶ 62.)  Plaintiff provides no evidence showing that it would have been reasonable for defendant to have contemplated at the time the alleged fraudulent statement was made that plaintiff's removal of funds from his IRA would result in a loss to plaintiff insofar as market conditions would improve, thus leaving plaintiff with a lower rate of return on the funds that he did pull from the account.

Furthermore, in order for defendant to have drawn such a conclusion at that time, defendant would have had to have presumed that both the markets would improve between the time it made the claimed misrepresentation and the present and that plaintiff would not remove or otherwise alter the holdings within his IRA during that same timeframe.  The law does not require defendant to engage in such speculation.  <u>Cf.</u> <u>O'Hara</u>, 75 Cal. App. 3d 798, 805 (1977) ("[A] person who makes false statements in order to sell property is not liable for damages when market forces, unknown to the seller and unrelated to the representations, later causes the buyer to suffer a financial loss.").

////

////

Plaintiff also argues that defendant's statement caused him financial harm because it caused him to suffer tax consequences that he otherwise would not have if he had not made those withdrawals in reliance on defendant's representations.  Plaintiff began withdrawing funds from his IRA in January 2010 and continued to withdraw $2,000 per month for the next fourteen months, until early 2011, resulting in a total withdrawal of $28,000.  (Newman Decl. ¶ 2, Exhibit 1 at 118:12-23.)  Plaintiff claims that he received $24,000 of the IRA disbursements in 2010, and the remaining $4,000 in 2011.  (Pl.'s SDF ¶ 186.)  Plaintiff points to his Internal Revenue Service ("IRS") Forms 1040 and 1045 for the 2010 and 2011 tax years as evidence in support of his argument that he suffered adverse tax consequences by removing these funds beginning in January 2010.  (Id.; Becker Decl. ¶ 80, Exhibit 81.)  However, plaintiff's IRS Forms 1040 for both 2010 and 2011 show that plaintiff had a negative adjusted gross income, even when the additional income taken from his IRA was taken into account,[15] which resulted in plaintiff having zero tax liability for both of those years.  (Becker Decl. ¶ 80, Exhibit 81 at 004459-004460, 004476-004477.)  Accordingly, the evidence in the record shows that the additional income in those years resulting from plaintiff's IRA withdrawals did not have direct tax consequences for plaintiff insofar as the additional income plaintiff received from them did not result in plaintiff owing more taxes in those two years than he would have had he not made them.

Plaintiff also claims that the IRA withdrawals effectively reduced plaintiff's Net Operating Loss ("NOL") carryover,[16] which plaintiff claims he would use "in the future as a direct offset against the sale of [his] rental properties."  (Pl.'s SDF ¶ 186.)  In other words, plaintiff claims that the additional income that resulted from his IRA withdrawals reduced the

---

[15] Plaintiff states in his Statement of Disputed Facts that he erred on his on his 2010 tax return by mistakenly including the $24,000 in IRA withdrawals as part of his pensions and annuities total income, instead of declaring the $24,000 in the separate "IRA Distributions" section.  (Pl.'s SDF ¶ 186.)   Plaintiff also states that he made a calculation error of $200.00 in the government's favor on that same return.  (Id.)  Nevertheless, even when these errors are taken into account, the evidence shows that plaintiff had a negative income for the 2010 tax year, thus giving rise to no tax liability for that year.

[16] Pursuant to 26 U.S.C. § 172, a taxpayer may take a tax deduction for the amount of a net operating loss sustained during a taxable year in each of the 20 taxable years following the taxable year of such a loss.

1  amount of operating losses plaintiff could claim for the 2010 and 2011 tax years, thus reducing

2  the deduction amount plaintiff could take in later years to reduce the taxes owed on income

3  generated in those years from the sale of his rental properties.  However, this claim of damages is

4  too speculative and is unsupported by the record.  Plaintiff provides no evidence showing that he

5  has obtained a positive net income for a tax year through the sale of any of his rental properties in

6  the years since 2011 to which this NOL carryover could be applied, or even that he has sold any

7  of his rental properties.  Furthermore, for plaintiff to suffer any future injury from the reduced

8  NOL carryover, the sale of his properties would have to result in a positive net income for the

9  particular tax year in which they were sold and plaintiff would have to elect to apply his NOL

10  carryover from 2010 and 2011 to deduct from that income.

11      More importantly, based on the record, it cannot be said that defendant could have

12  reasonably contemplated at the time it made the alleged misrepresentation that plaintiff's removal

13  of funds from his IRA could cause plaintiff to suffer a loss in the form of having a reduced NOL

14  carryover for deducting the amount of taxes owed on future operating income that plaintiff earned

15  once he decided to sell his rental properties.  See Alimena, 964 F. Supp. 2d at 1213 (quoting

16  O'Hara, 75 Cal.App.3d  at 142);  Small v. Fritz Companies, Inc., 30 Cal. 4th 167, 202 (2003) ("If

17  the existence—and not the amount—of damages alleged in a fraud pleading is 'too remote,

18  speculative or uncertain,' then the pleading cannot state a claim for relief.")  Accordingly,

19  plaintiff's argument that defendant caused him to suffer a loss by inducing him to draw from his

20  IRA account is without merit.

21      The record shows that plaintiff cannot show a cause and effect relationship between the

22  alleged fraudulent statements and the damages plaintiff claims he has suffered.[17]  Accordingly,

23  _____

24  [17] Plaintiff also argues in his opposition that he justifiably relied on the alleged misrepresentation
that defendant would grant him a loan modification if he submitted documentation verifying what
he told defendant's agent over the phone by submitting such documentation.  (ECF No. 184 at

25  23.)  Plaintiff also claims that this misrepresentation caused him to not get a loan modification for
which he was qualified, which resulted in plaintiff suffering damages in the form of not receiving

26  reduced monthly loan obligations and a reduction in the principal owed on his defaulted loans.

27  (Id.)  Plaintiff does allege such damages in the Third Amended Complaint.  However, as
defendant highlights in its reply briefing, the mere submission of paperwork, without more, does

28  not constitute reliance for purposes of a fraud claim.  See Rossberg, 219 Cal. App. 4th at 1499

1    defendant should be granted summary judgment in its favor on plaintiff's fraud claim.[18]

2              B.      Promissory Estoppel and RESPA

3           Plaintiff states in his opposition that he will no longer pursue his promissory estoppel

4    claim because the facts and remedies underlying this claim are similar to those contained within

5    plaintiff's fraud claims.  (ECF No. 184 at 32.)  Plaintiff further states that he also will not pursue

6    his RESPA claim because it "does not appear to be viable."  (Id.)  Based on these representations,

7    it appears that plaintiff concedes that these claims are meritless and consents to their dismissal.

8    Accordingly, these two claims should be dismissed with prejudice.

9              C.      Defamation

10         In the Third Amended Complaint, plaintiff alleges that he was defamed by defendants

11    when, in violation of the court's preliminary injunction in this case (ECF No. 21), defendant's

12    agent recorded and posted NOTSs at the 3rd Street Property and the Shelborne.  (Third Am.

13    Compl. ¶¶ 90-100.)  Plaintiff alleges that the statements made in these two NOTSs were

14    defamatory because "[t]he people who read the NO[T]Ss would reasonably understand the

15    NO[T]Ss mean that plaintiff is a deadbeat without integrity who does not pay his bills and cannot

16    be trusted."  (Id. at ¶ 96.)  Defendant asserts that it is entitled to summary judgment on this claim

---

17
18   (dismissing plaintiffs' fraud claim because allegations that plaintiffs executed numerous loan modification papers in reliance of defendant's allegedly fraudulent statement was insufficient to meet the element of reliance.  Moreover, plaintiff cannot demonstrate that these damages were
19   caused by defendant's misrepresentation because plaintiff was obligated to make payments on his original loans and defendant was not required to offer plaintiff a loan modification.  Finally,
20   "fraud claims addressing any alleged failure to modify [plaintiff's] loan sound in breach of contract rather than fraud."  See Nastrom v. JPMorgan Chase Bank, N.A., 2012 WL 5522795, at
21   *5 (E.D. Cal. Nov. 14, 2012).

22   [18] Plaintiff also argues in his opposition that defendant committed fraud because the substitution
23   of trustee ("SOT") documents were forged, therefore making the NOTSs for the Third Street Property and the Shelborne Property fraudulent because they misrepresent that Cal-Western is the
24   trustee for the deeds of trust on the properties.  (ECF No. 184 at 27.)  However, the court has already dismissed any allegations in the Third Amended Complaint contending that the SOTs for
25   these properties were forged in the context of plaintiff's other claims that have been either dismissed or narrowed.  (ECF No. 115 at 10-11; ECF No. 123.)  Moreover, plaintiff makes no
26   allegations in the Third Amended Complaint regarding this new theory in connection with his
27   claim for fraud.  Navajo Nation, 535 F.3d at 1080. ("[W]here . . . the complaint does not include the necessary factual allegations . . . , raising such a claim in a summary judgment motion is
28   insufficient to present the claim to the district court.").

1    on the basis that the evidence shows that the statements in the posted NOTSs were substantially

2    true, therefore precluding plaintiff from recovering under a defamation theory as a matter of law.

3        Defamation is an invasion of the plaintiff's interest in his reputation.  The elements of a

4    defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5)

5    has a natural tendency to injure or causes special damage.  Cal. Civ. Code §§ 45, 46; Taus v.

6    Loftus, 40 Cal.4th 683, 720 (2007).

7        '"In all cases of alleged defamation, whether libel or slander, the truth of the offensive

8    statements or communication is a complete defense against civil liability, regardless of bad faith

9    or malicious purpose.'"  Raghavan v. Boeing Co., 133 Cal. App. 4th 1120, 1132 (2005) (quoting

10   Smith v. Maldonado, 72 Cal.App.4th 637, 646 (1999)).  Generally, "[a] defendant is not liable for

11   defamation if he or she proves the truth of the alleged defamatory statement."  Innovative Bus.

12   Partnerships, Inc. v. Inland Counties Reg'l Ctr., Inc., 194 Cal. App. 4th 623, 632 (2011).  "[T]he

13   defendant need not justify the literal truth of every word of the allegedly defamatory matter.  It is

14   sufficient if the substance of the charge is proven true, irrespective of slight inaccuracy in the

15   details, 'so long as the imputation is substantially true so as to justify the '*gist or sting*' of the

16   remark.'"  Raghavan, 133 Cal. App. 4th at 1133 (quoting Ringler Associates Inc. v. Maryland

17   Casualty Co., 80 Cal. App. 4th 1165, 1180-81 (2000)) (emphasis in original); Innovative Bus.

18   Partnerships, Inc, 194 Cal. App. 4th at 632 ("Every detail of the statement need not be literally

19   true so long as the imputation is substantially true.").

20       Defendant argues that the statements in both of the recorded NOTSs of which plaintiff

21   complains were substantially true because those statements accurately reflected that plaintiff was

22   in default on his loans for both properties and correctly stated the amounts of debt plaintiff owed

23   for each respective loan.  Plaintiff does not controvert the fact that he was in default on both loans

24   at the time the NOTSs were posted.   (See Pl.'s Rebuttal to Def.'s SUF at ¶¶ 9, 10, 12).

25   Accordingly, the undisputed facts show that plaintiff did in fact default on both of the loans that

26   were the subject of the NOTSs, thus making the statements plaintiff claims to be defamatory true

27   insofar as they indicate that plaintiff did not pay his bills on those loans.

28   ////

Plaintiff, however, argues in his opposition and his Statement of Disputed Facts that the amounts owed on each loan stated in the NOTSs "are in error by thousands of dollars" because the totals incorrectly included foreclosure costs when "[n]o trustee's sale has occurred so there are no costs actually incurred for a sale." (ECF No. 184 at 36; Pl.'s SDF ¶¶ 181-182.) Plaintiff also argues that the NOTSs included other charges that he has either contested or paid. (Id.) However, even assuming that the amounts owed listed on the two NOTSs were "in error by thousands of dollars," this would not create a genuine issue of material fact with regard to whether the statements conveyed by the NOTSs were substantially true. A difference of a few thousand dollars owed does not go to the primary thrust of plaintiff's defamation claim, which is that the statements in the NOTSs would cause a reasonable person to believe that plaintiff is a "deadbeat without integrity who does not pay his bills and cannot be trusted." (Third Am. Compl. ¶ 96.) The alleged "sting" from these statements comes from the fact that the statements in the NOTSs indicated that plaintiff did not pay his bills on the loans for these two properties, not from the amounts the NOTSs indicated plaintiff owed on these two loans. As noted above, not every detail in an alleged defamatory statement needs to be proven true in order for the statement to be *substantially* true. See Raghavan, 133 Cal. App. 4th at 1133. Here, the evidence in the record shows that the primary imputation of the statements made in the NOTSs, that plaintiff was in default on the two loans and, thus, did not pay his bills on those loans, was substantially true. Accordingly, summary judgment should be granted for defendant with regard to plaintiff's defamation claim.

Plaintiff also argues in his opposition that the NOTSs were false because Cal-Western was not the true trustee since the recorded substitution of trustee ("SOT") documents were "forged with the intent to defraud." (ECF No. 184 at 34-36.) However, plaintiff does not premise his defamation claim in his third amended complaint on allegations that the NOTSs were false as a result of the SOTs being forged; rather, he only alleges that the statements in the NOTSs were false because they incorrectly reflected the amounts plaintiff owed on the loans that the NOTSs stated were being foreclosed on. Accordingly, plaintiff cannot now attempt to modify or otherwise further flesh out his pleadings in the third amended complaint concerning his

1    defamation claim based on this new allegation.  Wasco Prods., Inc., v. Southwall Techs., Inc., 435

2    F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh

3    out inadequate pleadings." (citation and internal quotation marks omitted)).

4          Finally, plaintiff also argues that the statements in the NOTSs are false because the

5    documents failed to state that plaintiff attempted to modify his loans, plaintiff obtained a

6    preliminary injunction against foreclosures on these properties, and plaintiff had filed a lawsuit

7    against defendant concerning the loans on these properties.  (ECF No. 184 at 34-36.)  However,

8    the assertion is also without merit because it is yet another attempt by plaintiff to raise a factual

9    issue based on allegations not previously pled in the Third Amended Complaint.  Wasco Prods.,

10   Inc., v. Southwall Techs., Inc., 435 F.3d 989, 992.  Furthermore, plaintiff cites to no authority

11   indicating that the inclusion of such information was required for the statements in the NOTSs to

12   be substantially true.[19]

13          D.      Intentional Infliction of Emotional Distress

14          Plaintiff claims in the Third Amended Complaint that defendant is liable for intentional

15   infliction of emotional distress ("IIED") based on allegations that defendant's agent, Cal-Western,

16   acted with reckless disregard when it recorded the NOTSs for the Third Street Property and the

17   Shelborne Property in violation of the court's preliminary injunction.[20]  (Third Am. Compl. ¶¶

18   144-148.)  Defendant argues that it is entitled to summary judgment on this claim because the

19   undisputed facts in the record show that plaintiff was not present at the time the NOTSs were

20   recorded, thus precluding plaintiff from succeeding on his IIED claim under California law.

21   ////

22   ////

23

24   [19] Because the court agrees that defendant is entitled to summary judgment as to plaintiff's
     defamation claim on the basis that the alleged defamatory statements in the NOTSs were
25   substantially true, the court declines to address defendant's other arguments concerning this
     claim.
26

27   [20] The court previously denied plaintiff leave to amend to also premise his IIED claim on
     allegations in the Third Amended Complaint pertaining to the loan modification process.  (ECF
28   No. 115 at 12; ECF No. 123.)

The elements of a claim for IIED are as follows: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Ess v. Eskaton Props., Inc., 97 Cal.App.4th 120, 129 (2002) (quoting Cervantez v. J.C. Penney Co., 24 Cal.3d 579, 593, 156 (1979)).  Outrageous conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community."  Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993).  Emotional distress is "severe" when it is "of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Fletcher v. W. Nat'l Life Ins. Co., 10 Cal.App.3d 376, 397 (1970).  The defendant's conduct must have been intended to inflict injury or be done with the realization that injury will result. Christensen v. Superior Court, 54 Cal.3d 868, 903 (1991).  Moreover, the defendant's conduct must have been "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware."  Id.  The California Supreme Court has further explained:

> "The law limits claims of intentional infliction of emotional distress to egregious conduct toward plaintiff proximately caused by defendant." . . . The only exception to this rule is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff. . . . Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs is recognized as the element establishing a higher degree of culpability which, in turn, justifies recovery of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory. . . .

Id. at 905-06 (citations omitted).  "It is the plaintiff's burden to prove a prima facie case of IIED; a defendant can seek summary judgment by 'pointing out the absence of evidence to support plaintiff's claim.'"  Rhodes v. Sutter Health, 940 F. Supp. 2d 1258, 1265 (E.D. Cal. 2013) (quoting Dove v. PNS Stores, Inc., 982 F.Supp. 1420, 1425 (C.D. Cal. 1997)).

Here, plaintiff's IIED claim is premised on the theory that defendant's agent "acted with reckless disregard for of the probability of causing plaintiff severe emotional distress" when it recorded the NOTSs for both the Third Street Property and the Shelborne Property in violation of

26

1   the court's preliminary injunction.  (Third Am. Compl. ¶ 145.)  This allegation makes it clear that

2   plaintiff's IIED claim is based on a theory of reckless disregard.  "Where reckless disregard of the

3   plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the

4   outrageous conduct occurs is recognized as the element establishing a higher degree of

5   culpability" that gives rise to a claim for IIED.  Christensen v. Superior Court, 54 Cal.3d 868, 903

6   (1991); Ess, 97 Cal. App. 4th at 131 (citing Christensen, 54 Cal.3d at 906) ("[W]hen the

7   plaintiff's claim is based on alleged recklessness, it is generally, if not always, required that the

8   plaintiff be present at the time the outrageous conduct occurred.").

9        Plaintiff's IIED claim is premised entirely on the fact that defendant's agent posted and

10  recorded the NOTSs for the two properties in violation of the court's preliminary injunction

11  restricting defendant from foreclosing on these properties.  However, the undisputed evidence on

12  record shows that plaintiff was not present at the time when defendant's agents posted or recorded

13  the NOTSs and that plaintiff only later became aware of this action after he was informed by the

14  tenants residing at the properties to which the NOTSs had been posted.  Indeed, plaintiff admits in

15  his opposition that he "was not present in either the Placer County Recorder's Office or the San

16  Joaquin County Recorder's Office when the documents were recorded."  (ECF No. 184 at 38.)

17  Furthermore, plaintiff does not dispute the fact that he did not see the NOTSs being posted on

18  either property, nor does he dispute the fact that he first learned about both NOTSs when the

19  tenants residing at each property called plaintiff regarding the posting of the documents and then

20  handed plaintiff the documents when he came to inspect.  (Def.'s SUF ¶¶ 74, 76; Pl.'s Rebuttal to

21  Def.'s SUF ¶¶ 74, 76.)  Because the undisputed facts show that plaintiff was not present at the

22  time defendant's agent engaged in the alleged outrageous conduct, i.e. the recording and posting

23  of the NOTSs for the two properties, plaintiff cannot succeed on his IIED claim as a matter of

24  law.  See Ess, 97 Cal. App. 4th 120 (dismissing plaintiff's IIED claim based on alleged

25  recklessness because plaintiff was not present at the time of the alleged injury-causing event).

26       Plaintiff argues in his opposition that, even though he was not present when the NOTSs

27  were recorded, he still satisfied the "presence" element for an IIED claim based on a theory of

28  reckless conduct because "the recording of the documents [was] the initiation of an event that

covers an extended period of time." (ECF No. 184 at 38.)  Plaintiff asserts that, since the time the two NOTSs were recorded, defendant "has forced the documents on [plaintiff] several times in the public domain over an extended period of time."  (Id.)  Specifically, plaintiff claims that the NOTSs were recorded for all to see, that plaintiff "had to include [the NOTSs] as exhibits in his motions for an order to show cause to prevent the sales [of his two properties]," and that defendant placed the NOTSs into the public domain when it attached them as exhibits to the declaration of Michael Dolan in support of the present motion for summary judgment.  (Id.) Plaintiff further argues that he "was present when he wrote his orders to show cause and included the documents as exhibits" and was present when he was served defendant's motion for summary judgment, which contains the NOTSs as exhibits.  (Id.)  However, plaintiff cites no authority in support for his contention that the repeated placement of these documents into public records and to plaintiff after the alleged outrageous act already occurred somehow satisfied the element that plaintiff be "present" when defendant's agent engaged in the reckless conduct, i.e. the initial posting and recording of the NOTSs.  The events plaintiff claims to have been "present" for were not the alleged outrageous event and were temporally far removed from that event.  Plaintiff's arguments as to this issue are without merit.  Accordingly, defendant should be granted summary judgment with respect to plaintiff's IIED claim.[21]

     E.     Negligence-Based Claims

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the plaintiff's injury."  Mendoza v. City of Los Angeles, 66 Cal.App.4th 1333, 1339 (1998) (citation omitted).  "The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence."  Nymark v. Heart Fed. Savings & Loan Assn., 231 Cal.App.3d 1089, 1095 (1991).  "[A]bsent a duty, the defendant's care, or lack of care, is irrelevant."  Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., 49 Cal.App.4th 472,

---

[21] Because the court agrees that defendant is entitled to summary judgment as to plaintiff's IIED claim on the basis that plaintiff was not present at the time of the alleged outrageous conduct, the court finds it unnecessary to address defendant's other contentions regarding this claim.

1    481 (1996).  "The existence of a legal duty to use reasonable care in a particular factual situation

2    is a question of law for the court to decide."  Vasquez v. Residential Investments, Inc., 118

3    Cal.App.4th 269, 278 (2004) (citation omitted).

4         "The 'legal duty' of care may be of two general types:  (a) the duty of a person to use

5    ordinary care in activities from which harm might reasonably be anticipated [, or] (b) [a]n

6    affirmative duty where the person occupies a particular relationship to others . . . .  In the first

7    situation, he is not liable unless he is actively careless; in the second, he may be liable for failure

8    to act affirmatively to prevent harm."  McGettigan v. Bay Area Rapid Transit Dist., 57

9    Cal.App.4th 1011, 1016-17 (1997).

10        Defendant argues that it owed no legal duty of care to plaintiff, thus entitling it to

11   summary judgment on plaintiff's negligence-based claims as a matter of law.  More specifically,

12   it argues that its interactions with plaintiff regarding the servicing and modification of his loans at

13   issue in this case were not outside the domain of a typical money lender, thus resulting in it owing

14   no duty of care to plaintiff when it engaged in these activities. (ECF No. 179 at 35-39.)

15        The court earlier dismissed this argument when denying defendant's motion to dismiss

16   plaintiff's Third Amended Complaint, noting that while "'[n]umerous cases have characterized a

17   loan modification as a traditional money lending activity' that does not give rise to a duty of care .

18   . . at least some district courts have held that a duty of care can arise in connection with a lender's

19   'processing [a] loan modification application' depending on the lender's alleged conduct in the

20   modification process."  (ECF No. 137 at 17-18 (quoting Armstrong v. Chevy Chase Bank, FSB,

21   2012 WL 4747165, at *4 (N.D. Cal. Oct. 3, 2012), and Garcia v. Ocwen Loan Serv., 2010 WL

22   1881098, at *3 (N.D. Cal. May 10, 2010))).  The court previously denied defendant's argument

23   primarily based on the fact that defendant only minimally applied the cases it cited to in its

24   motion to dismiss to the particular facts of this case and did not adequately address the cases with

25   facts similar to those alleged by plaintiff where the courts found the lender to owe a duty of care

26   to the plaintiff, particularly Ansanelli v. JP Morgan Chase Bank, N.A., 2011 WL 1134451 (N.D.

27   Cal. Mar. 28, 2011), Crilley v. Bank of Am., N.A., 2012 WL 1492413 (D. Haw. April 26, 2012),

28   and Garcia, 2010 WL 1881098.  (ECF No. 137 at 19.)

1    In its present motion, defendant highlights the fact that in the time period since the court's

2    denial of defendant's motion to dismiss the third amended complaint, both California state courts

3    and the federal district courts in California overwhelmingly have adopted the view that no duty of

4    care is owed by a lender to a borrower when engaging in the loan modification process and have

5    either rejected, criticized, or ignored earlier decisions that have adopted the view that a lender can

6    owe a duty of care under such circumstances.  Defendant asserts that the court should adhere to

7    the conclusion reached by California's Fourth District Court of Appeal in Lueras v. BAC Home

8    Loans Servicing, LP, 221 Cal. App. 4th 49 (2013), that a lender does "not have a common law

9    duty of care to offer, consider, or approve a loan modification," or a duty to handle a borrower's

10   "loan 'in such a way to prevent foreclosure and forfeiture of his property.'"  Id. at 68.  Defendant

11   further argues that virtually every ruling in this district involving a claim of negligence based on

12   allegations of negligent handling of a loan modification has either agreed with the holding in

13   Lueras or independently determined prior to Lueras that a lender owes no duty of care under

14   circumstances similar to those presented here.  (ECF No. 179 at 36-37.)  Finally, defendant

15   addresses the court's earlier misgiving regarding the existence of a minority of cases finding that

16   a duty can arise in the context of the loan modification process by providing a discussion in its

17   briefing indicating that the majority of district courts that have decided this issue have held that

18   those contrary cases were wrongly decided.  The court finds persuasive defendant's argument and

19   the majority position in the case law that a financial institution engaging in the typical loan

20   modification process for a residential loan does not exceed the traditional scope of a money

21   lender.

22   Generally, under California law, there are no duties owed by a lender to a borrower

23   beyond those expressed in the loan agreement when loan transactions are arms-length.

24   Resolution Trust Corp. v. BVS Dev., 42 F.3d 1206, 1214 (9th Cir. 1994) (citing Nymark, 231

25   Cal.App.3d at 1096).  "Liability to a borrower for negligence arises only when the lender

26   'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.'"

27   Wagner v. Benson, 101 Cal.App.3d 27, 35 (1980); Nymark, 231 Cal.App.3d at 1096 ("[A]s a

28   general rule, a financial institution owes no duty of care to a borrower when the institution's

30

1    involvement in the loan transaction does not exceed the scope of its conventional role as a mere

2    lender of money.");  see also Myers v. Guarantee Sav. & Loan Assn., 79 Cal.App.3d 307, 312

3    (1978) (no lender liability when lender did not engage "in any activity outside the scope of the

4    normal activities of a lender of construction monies").

5           As defendant highlights, the majority of cases that have addressed the issue of whether a

6    financial institution owes a duty to a borrower when engaging in the loan modification process

7    have resulted in a holding that such activity generally does not exceed the traditional scope of a

8    money lender, thus resulting in the lack of a duty of care owed by the lender.  E.g., Deschaine v.

9    IndyMac Mortgage Servs., 2013 WL 6054456, at *7 (E.D. Cal. Nov. 15, 2013) (dismissing

10   negligence claim "[b]ecause the majority of California courts hold that loan modification

11   activities are part and parcel of a loan servicer's 'conventional role as a lender of money,' and

12   because plaintiff has not alleged any facts that show a special relationship with [defendant]."

13   (citation omitted)); Lueras, 221 Cal. App. 4th at 67 ("We conclude a loan modification is the

14   renegotiation of loan terms, which falls squarely within the scope of a lending institution's

15   conventional role as a lender of money."); Diunugala v. JP Morgan Chase Bank, N.A., 2013 WL

16   5568737,  at *4 (S.D. Cal. Oct. 3, 2013) ("Absent special circumstances, there is no duty for a

17   servicer to modify a loan."); Sanguinetti v. CitiMortgage, Inc., 2013 WL 4838765, at *6 (N.D.

18   Cal. Sept. 11, 2013) ("Loan modifications are part of the lending process, and negotiating a

19   lending agreement's terms is one of a bank's key functions."); Bunce v. Ocwen Loan Servicing,

20   LLC, WL 3773950, at *5-*6 (E.D. Cal. July 17, 2013) (holding that a lender does not owe duty in

21   loan modification activities); Armstrong v. Chevy Chase Bank, FSB, 2012 WL 4747165, at *4

22   (N.D. Cal. Oct. 3, 2012) ("Outside of actually lending money, it is undebatable that negotiating

23   the terms of the lending relationship is one of the key functions of a money lender.  For this

24   reason, '[n]umerous cases have characterized a loan modification as a traditional money lending

25   activity.'" (citations omitted)); Dooms v. Federal Home Loan Mortgage Corp., 2011 WL

26   1232989, at *12 (E.D. Cal. Mar. 31, 2011) ("The [lender] owed no duty of care to [the borrower]

27   arising from her default, property foreclosure, and loan modification attempts"); DeLeon v. Wells

28   Fargo Bank, N.A., 2010 WL 4285006, at *45 (N.D. Cal., Oct. 22, 2010)  (holding that the

1   defendant lender did not have a duty "to complete the loan modification process").

2          Furthermore, while some cases have determined that that loan modification activities

3   extend beyond the typical role of a money lender or loan servicer, most notably Ansanelli v. JP

4   Morgan Chase Bank, N.A., 2011 WL 1134451 (N.D. Cal. Mar. 28, 2011), such cases have been

5   discounted by the large majority of the courts that have subsequently addressed the issue.  See

6   Lueras, 221 Cal. App. 4th 49; Deschaine, 2013 WL 6054456, at *6 ("Ansanelli and its progeny

7   represent a minority position."); Bunce, 2013 WL 3773950, at *6 ("Courts have disagreed with

8   Ansanelli's finding that loan modification activities extend beyond the role of a money lender or

9   loan servicer. . . . This court, like the court in Armstrong, finds Ansanelli unpersuasive.");

10  Armstrong, FSB, 2012 WL 4747165, at *4 ("[N]umerous cases have characterized a loan

11  modification as a traditional money lending activity . . . . The minority of cases which hold

12  otherwise, such as Ansanelli . . . are unpersuasive." (citations omitted)).  The district courts that

13  have found Ansanelli and its progeny unpersuasive have primarily relied on the fact that "a loan

14  modification, which at its core is an attempt by a money lender to salvage a troubled loan, is

15  nothing more than a renegotiation of loan terms" and that "negotiating the terms of the lending

16  relationship is one of the key functions of a money lender."  Armstrong, 2012 WL 4747165, at

17  *4; see also Deschaine, 2013 WL 6054456, at *6; Bunce, 2013 WL 3773950, at *6; Settle v.

18  World Sav. Bank, F.S.B., 2012 WL 1026103, at *8 (C.D. Cal. Jan. 10, 2012) (noting that

19  "numerous cases have characterized a loan modification as a traditional money lending activity"

20  and listing cases).  More importantly, this approach was recently confirmed by the California

21  Court of Appeal in Lueras, which noted that "a loan modification is the renegotiation of loan

22  terms, which falls squarely within the scope of a lending institution's conventional role as a

23  lender of money."  Lueras, 221 Cal. App. 4th at 67; see also Williams v. Wells Fargo Bank, NA,

24  2014 WL 1568857, at *7 (C.D. Cal. Jan. 27, 2014) (noting the importance of Lueras' holding in

25  confirming the majority position in the federal district courts that loan modification activities are

26  a traditional money lending activity that does not give rise to a duty of care on the part of the

27  lender).

28  ////

Plaintiff argues in his opposition that <u>Lueras</u> and the cases listed by defendant that take the majority position on this issue either do not analyze or otherwise conflict with the Ninth Circuit Court of Appeals' holding in <u>Mid-Cal Nat. Bank v. Fed. Reserve Bank of San Francisco</u>, 590 F.2d 761 (9th Cir. 1979).  (ECF No. 184 at 45-46.)  However, plaintiff does not show how this assertion is of any relevance to the present case because <u>Mid-Cal Nat. Bank</u> did not address the issue presented by this case, or the other cases addressing whether a lender owes a duty to a borrower in the context of residential loan modification activities.  Rather, that case presented the issue of "whether one bank owes a legal duty to another bank to discover a check kiting scheme that results in a loss to the second bank."  <u>Mid-Cal Nat. Bank</u>, 590 F.2d at 762.  Furthermore, the court in that case determined that the first bank owed no duty to discover a kite scheme.  <u>Id.</u> at 764.  Plaintiff's reliance on <u>Mid-Cal Nat. Bank</u> to support his argument that defendant owed plaintiff a duty of care in handling his loan modification application is misplaced.

Here, the evidence on record does not suggest that defendant's loan modification activities exceeded the role of money lender or loan servicer.  The evidence shows that defendant and its agents engaged with plaintiff in the loan modification process by discussing with plaintiff the possibility of a loan modification, sending plaintiff loan modification paperwork, receiving plaintiff's modification documentation, informing plaintiff of additional steps he would need to take to further the process, and ultimately denying plaintiff's applications.  Such activities fall squarely within the scope of defendant's role as a money lender.  <u>See, e.g.</u>, <u>Lueras</u>, 221 Cal. App. 4th at 67.  Similarly, to the extent plaintiff's negligence claim is premised on defendant's attempted foreclosure of the defaulted properties, such activities also fall within the scope of defendant's conventional role as a mere lender of money.  <u>See</u> <u>Dooms</u>, 2011 WL 1232989, at *12 ("The [lender] owed no duty of care to [the borrower] arising from her default, property foreclosure, and loan modification attempts.").  Defendant owed plaintiff no duty of care with respect to its loan modification and foreclosure efforts.  Accordingly, plaintiff cannot succeed on his negligence claim as a matter of law and defendant should be granted summary judgment in its favor.

////

1    Plaintiff also alleges a claim for negligent infliction of emotional distress in his third

2    amended complaint.  As noted in earlier orders, "'there is no independent tort of negligent

3    infliction of emotional distress.'" (ECF No. 137 at 16 (quoting Potter v. Firestone Tire & Rubber

4    Co., 6 Cal. 4th 965, 984 (1993)).  Accordingly, in order to prove a claim for emotional distress

5    damages arising from negligence, a plaintiff must prove the same elements required for a

6    negligence claim.  Lawson v. Management Activities, Inc., 69 Cal. App. 4th 652, 655-57 (1999).

7    Because plaintiff cannot show that defendant owed plaintiff a duty of care, plaintiff also cannot

8    prevail on his claim for negligent infliction of emotional distress as a matter of law.  Accordingly,

9    defendant should be granted summary judgment with respect to this claim as well.

10    Finally, plaintiff argues in his opposition that Lueras and subsequent decisions have held

11    that there is a duty for lenders to not make negligent misrepresentations of fact to a borrower in

12    connection with the loan modification process.  (ECF No. 184 at 44-45.)  Although the court in

13    Lueras held that the plaintiff in that case could not state a negligence claim because the defendant

14    had no "common law duty to offer or approve a loan modification," it nonetheless concluded that

15    "a lender does owe a duty to a borrower to not make material misrepresentations about the status

16    of an application for a loan modification or about the date, time, or status of a foreclosure sale."

17    Lueras, 221 Cal. App. 4th at 67-68.  While plaintiff is correct that Lueras stands for the

18    proposition that a lender has a duty to not make material misrepresentations in connection with

19    the loan modification process, such a duty goes towards a claim for negligent misrepresentation,

20    not a claim for negligence.  Deschaine, 2014 WL 281112, at *7 ("To the extent that plaintiff has

21    alleged that [defendant] violated a duty not to misrepresent facts about the modification and

22    foreclosure process, those allegations sound in negligent misrepresentation, rather than

23    negligence.").  In essence, plaintiff's argument appears to be a procedurally improper attempt to

24    mutate his negligence claim into a claim for negligent misrepresentation, a separate cause of

25    action not alleged in the operative Third Amended Complaint.[22]  Accordingly, plaintiff's

26    _____

27    [22] Perhaps in recognition of this fact, plaintiff requests in his opposition that the court grant him leave to amend his negligence claim.  (ECF No. 184 at 48.)  Plaintiff also made a request for leave to amend this claim to a claim for negligent misrepresentation in his motion to amend the

28    scheduling order in this case, which was filed after briefing for the present motion was complete.

1   argument is without merit.[23]

2        F.    RICO

3        Plaintiff alleges in the Third Amended Complaint that defendant violated the Racketeer

4   Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962 et seq., through its

5   activities during the loan modification process.  (ECF No. 98 at ¶¶ 118-27.)  Defendant argues,

6   *inter alia*, that it is entitled to summary judgment on this claim because plaintiff provides no

7   evidence showing that defendant was a part of an "enterprise" within the meaning of RICO.  The

8   court agrees with defendant.

9        A plaintiff must make the following showing in order to state a civil RICO claim under

10  Title 18 U.S.C. § 1962(c): "(1) conduct (2) of an enterprise (3) through a pattern (4) of

11  racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or

12  property.'"  Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir.

13  2005) (quoting Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996); 18 U.S.C. §§ 1964(c),

14  1962(c); see also Sanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir. 2010) (quoting

15  Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (en banc)); Forsyth v. Humana, Inc.,

16  114 F.3d 1467, 1481 (9th Cir. 1997).

17       Title 18 U.S.C. § 1962(c) provides:  "It shall be unlawful for any person employed by or

18  associated with any enterprise" to conduct or participate in the conduct of the enterprise's affairs

19  through a pattern of racketeering activity.  RICO broadly defines "enterprise" to include "any

20  individual, partnership, corporation, association, or other legal entity, and any union or group of

21  individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The existence of

22  an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by

23

24  (ECF No. 188 at 32.)  Plaintiff's motion to amend the scheduling order was denied both in the
    first instance and upon reconsideration by the presiding district judge.  (ECF No. 194; ECF No.
25  196.)

26  [23] Because the court agrees that defendant is entitled to summary judgment as to plaintiff's
27  negligence and negligent infliction of emotional distress claims on the basis that it did not owe
    plaintiff a duty of care, the court declines to address defendant's other arguments concerning
28  these two claims.

                                        35

1   evidence that the various associates function as a continuing unit." <u>United States v. Turkette</u>, 452

2   U.S. 576, 583 (1981).

3       "For the purposes of section 1962(c), RICO plaintiffs must allege a defendant—the

4   'person' or 'persons'—who is distinct from the 'enterprise' whose business the defendant is

5   conducting." <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1534 (9th Cir. 1992).  An "enterprise"

6   is "'a being different from, not the same as or part of, the person whose behavior the act was

7   designed to prohibit.'"  <u>Rae v. Union Bank</u>, 725 F.2d 478, 481 (9th Cir. 1984) (quoting <u>United</u>

8   <u>States v. Computer Sciences Corp.</u>, 689 F.2d 1181, 1190 (4th Cir. 1982), <u>cert. denied</u>, 459 U.S.

9   1105 (1983)).  "[F]or the purposes of a single action, a corporate defendant cannot be both the

10  RICO person and the RICO enterprise under section 1962(c)." <u>Sever</u>, 978 F.2d at 1534; <u>see also</u>

11  <u>Wilcox v. First Interstate Bank of Oregon</u>, 815 F.2d 522, 529 (9th Cir. 1987).

12      Here, the evidence in the record shows that Wachovia Mortgage Company merged into

13  and began to operate as a part of Wells Fargo Bank, N.A., Inc. effective November 1, 2009.

14  (Dolan Decl. ¶ 2, Exhibit A.)  Therefore, plaintiff cannot show that defendants Wachovia

15  Mortgage Company and Wells Fargo Bank, N.A., Inc. are distinct entities for purposes of RICO,

16  because they became the same, singular corporate entity as a result of this merger.  Consequently,

17  plaintiff cannot show the existence of an enterprise for purposes of a RICO claim because the

18  single corporate entity that resulted from this merger cannot be both the "person" and the

19  "enterprise" under section 1962(c).  <u>Sever</u>, 978 F.2d at 1534; <u>see also</u> <u>Ayala v. World Sav. Bank,</u>

20  <u>FSB</u>, 616 F. Supp. 2d 1007, 1019 (C.D. Cal. 2009) (holding that plaintiff did not properly allege

21  the existence of a RICO enterprise between World Bank and Wachovia because the judicially

22  noticed facts showed that the two defendants became a single corporate entity when World Bank

23  merged into Wachovia).

24      Plaintiff argues in his opposition that a RICO enterprise existed between Wells Fargo and

25  its vendors Cal-Western and First American Title Insurance Company.  (ECF No. 184 at 45.)

26  Specifically, plaintiff asserts that "Wells Fargo engaged with Cal-Western Reconveyance Corp.

27  and First American Title Insurance Company for over a year to create fraudulent foreclosure

28  documents to foreclose on homes."  (<u>Id.</u>)  However, by previous order plaintiff was permitted to

1    pursue his RICO claim only based upon allegations of fraudulent statements made in connection

2    with the loan modification process, which only concerned the actions of Wachovia and Wells

3    Fargo.  (ECF No. 98 at ¶¶ 119-127; ECF No. 115 at 12; ECF No. 123 at 2.)  In that same order,

4    the court dismissed plaintiff's RICO allegations in the Third Amended Complaint insofar as they

5    pertained to a claim based on "robosigning," which concerned defendant's interactions with Cal-

6    Western and First American Title Insurance Company.  (ECF No. 98 at ¶¶ 128-136; ECF No. 115

7    at 12; ECF No. 123 at 2.)  Plaintiff's argument appears to be yet another attempt at an end-run

8    around the court's previous orders dismissing claims based on such allegations and, therefore,

9    cannot be used as a basis for establishing that a RICO enterprise existed.

10        Because the evidence shows that no enterprise existed, plaintiff cannot prove a civil RICO

11   claim as a matter of law.  Accordingly, the court recommends that defendant be granted summary

12   judgment with respect to plaintiff's RICO claim.[24]

13        G.    UCL

14        To prove a claim under the California's Unfair Competition Law ("UCL"), a plaintiff

15   must show "that the defendant committed a business act that is either fraudulent, unlawful, or

16   unfair."  Levine v. Blue Shield of California, 189 Cal. App. 4th 1117, 1136 (2010).  "A defendant

17   cannot be liable under § 17200 for committing 'unlawful business practices' without having

18   violated another law."  Ingels v. Westwood One Broad. Servs., Inc., 129 Cal. App. 4th 1050,

19   1060 (2005).  Accordingly, a UCL claim must rest on a violation of some independent substantive

20   statute, regulation or case law. See Farmers Ins. Exch. v. Superior Court, 2 Cal.4th 377, 383

21   (1992) (action under section 17200 borrows violations of other laws).  Because plaintiff's UCL

22   claim is predicated on the same conduct giving rise to plaintiff's other causes of action, for all of

23   which defendant is entitled to summary judgment in its favor, defendant should also be granted

24   summary judgment as to plaintiff's UCL claim.[25]

---

25   [24] Because the court agrees that defendant is entitled to summary judgment on the basis that no
26   RICO enterprise existed, the court declines to address defendant's other arguments concerning
     plaintiff's RICO claim.

27   [25] Because the court finds that defendant's motion for summary judgment should be granted in
28   full for the reasons stated above, the court does not consider defendant's additional arguments

V.     <u>CONCLUSION</u>

Accordingly, for the reasons outlined above, IT IS HEREBY RECOMMENDED that:

1.  Defendant's Motion for Summary Judgment (ECF No. 179) be GRANTED in full.

2.  Judgment be entered for defendants Wells Fargo Bank, NA, Inc. and Wachovia Mortgage Corporation.

3.  The Clerk of Court be directed to close this case and vacate all dates.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO RECOMMENDED.

Dated:  August 7, 2014

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

---

that plaintiff's state law claims are preempted under the Home Owner's Lending Act and that defendant is entitled to summary adjudication on the issue of punitive damages.